**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

STATE OF FLORIDA,

      Plaintiff,

v.                                    Case No 3:23-cv-9962

Alejandro Mayorkas;
et. al,

      Defendants.

_____

**OPPOSITION TO EMERGENCY MOTION FOR A TEMPORARY**
**RESTRAINING ORDER**

**INTRODUCTION**

Florida asks this Court to enter a temporary restraining order preventing DHS from using its parole authority under 8 U.S.C. § 1182(d)(5) to address an emerging challenge at the southwest border, including a new parole policy specifically developed for that purpose. The Court should deny this request to limit the Executive's authority to carry out a core Executive function, managing the border, particularly on an emergency basis without the benefit of full briefing on the eve of an expected dramatic increase in arrivals at the border.

On May 10, 2023, U.S. Customs and Border Protection issued a Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document. *See* ECF No. 5-1. The Parole with Conditions policy was issued on an emergency basis in anticipation of a significant increase in arrivals at the southwest border following the end of the Title 42 health order that is anticipated to overwhelm border facilities. Florida argues that this policy is merely an "attempted workaround" of this Court's ruling that the Parole + Alternatives to Detention Policy improperly used parole for "operational convenience" in violation of the parole statute, 8 U.S.C. § 1182(d)(5), and should have been issued only following an opportunity for public notice and comment. Mot. at 1-3. However, there are important distinctions between the Parole + ATD policy and the policy CBP has now promulgated. The Parole with Conditions policy is substantively different from the prior policies in important

ways, including that the grant of parole is time limited and the policy focuses to an even greater degree on ensuring the health and safety of individuals. And the policy was adopted in markedly different circumstances that make clear that going through notice and comment rulemaking would not have been possible.

Far from using parole merely for "operational convenience," Parole with Conditions was adopted for use as necessary to address an imminent and dramatic increase arrivals at the southwest border in the coming days and the elimination of Title 42 expulsion authority. As this Court acknowledged, arrivals are expected to skyrocket "when the Title 42 Order is no longer in place." *Florida v. United States*, 2023 WL 2399883, at *3 (N.D. Fla. Mar. 8, 2023).

In the past months, DHS has taken various steps to prepare in advance for this coming crisis and developed a comprehensive plan to manage the border. For example, DHS has established processes to allow nationals of certain countries— countries to which it is very difficult to return their nationals—to seek advanced case-by-case consideration of their applications from abroad, coupled with advanced vetting, and negotiated for prompt return to Mexico of migrants from those countries who do not enter through this process. *See, e.g.*, 88 Fed. Reg. 1279. This has resulted in a dramatic reduction in irregular migration from those countries.  DHS has also expanded use of the CBP One mobile app, which allows noncitizens to schedule a time to arrive at ports of entry along the southwest border for orderly processing.

DHS has also finalized a rule that makes noncitizens who do not enter through lawful pathways or seek protection in third countries, and instead enter the United States at the southwest border without prior authorization, presumptively ineligible for a discretionary grant of asylum. *See* 88 Fed. Reg. 11,704. And the Secretary of Homeland Security has announced other measures to respond to the anticipated surge in arrivals, including moving personnel, increasing processing efficiency to mitigate potential overcrowding, and administering consequences for unlawful entry, including removal, detention, and prosecution. *See* https://www.dhs.gov/news/2023/05/01/fact-sheet-update-dhs-planning-southwest-border-security-measures-title-42-public.

Nonetheless, a significant risk remains that the increase in arrivals will be great enough that these measures are insufficient to mitigate the risk of overcrowding at border facilities that could overwhelm the border and raise serious health and safety risks to noncitizens and immigration officials. Parole with Conditions is designed not for operational convenience, but rather precisely for such an emergency situation at the border. Thus, it can only be used in certain exigent circumstances, such as where U.S. Border Patrol has apprehended over 7,000 noncitizens per day across the southwest border over a 72-hour period, or where the average time in custody has exceeded 60 hours. *Id*. at 4 And it can be used only when "specifically

requested by a sector and authorized by the CBP commissioner." ECF No. 5-1 at 3.
.

DHS is exercising all available authority to address the anticipated surge in migrants, but its available staffing and facilities to safely process and issue charging documents to record numbers of new arrivals are limited. In the face of an imminent crisis, DHS must make use of all available statutory authority Congress has granted it to process migrants, including parole. Given the limitations on other available options, once those options are exhausted, parole may be a necessary alternative. An order restricting DHS's parole authority on the eve of this crisis has the serious potential to cause chaos and undermine the security of the border and the safety of border officials. The resulting harm to the public from such an injunction far outweighs the more remote financial harms raised by Florida.

Accordingly, the Court should deny the motion for a temporary restraining order. Given the stakes of enjoining a policy necessary to managing the border in the coming days, at a minimum the Court should allow time for a hearing before issuing any injunctive relief. If, however, the Court elects to issue injunctive relief without first allowing for a hearing, Defendants respectfully request that the Court enter a temporary administrative stay of any order for a reasonable amount of time to allow Defendants to evaluate whether to pursue emergency appellate review.

## LEGAL AND PROCEDURAL BACKGROUND

Legal Background. The Executive Branch has broad constitutional and statutory power over the administration and enforcement of the nation's immigration laws. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see, e.g.*, 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a)(3). Noncitizens who lack valid entry documentation or enter the country without inspection are inadmissible and potentially removable. 8 U.S.C. §§ 1182(a)(6)-(7). However, DHS has "broad discretion" to decide "whether it makes sense to pursue removal at all." *Arizona*, 567 U.S. at 396. If removal is initiated, the Executive nevertheless maintains the discretion to halt removal proceedings at any stage "for humanitarian reasons or simply for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999). The government may detain noncitizens it does decide to remove on the basis of their civil immigration offenses "for the limited period necessary for their removal proceedings." *Demore v. Kim*, 538 U.S. 510, 526 (2003).

"Applicants for admission" are noncitizens who are present in the United States without being admitted or "who arrive[] in the United States" "whether or not at a designated port of arrival." *See* 8 U.S.C. § 1225(a)(1). Those who apply for admission or attempt to apply to the United States via a port-of-entry are termed "arriving aliens." 8 C.F.R. §§ 1.2, 1001.1(q). "Arriving aliens," and certain other noncitizens such as those who have entered the United States without having been admitted or paroled and are apprehended within 100 miles of the border and 14 days

of entry, may, in the discretion of DHS, be placed in expedited removal procedures under section 1225(b)(1). 8 U.S.C. § 1225(b)(1)(A); 69 Fed. Reg. 48,877 (Aug. 11, 2004).[1] Arriving aliens, and other applicants for admission not placed in expedited removal proceedings, but who "are not clearly and beyond a doubt entitled to admission," may alternatively be placed in full removal proceedings under section 1229a. *See* 8 U.S.C. § 1225(b)(2)(A).[2] While these categories of applicants for admission *may* be placed into these proceedings, they need not be. Section 1225 "does not limit the authority of DHS to determine whether to pursue the removal of the immigrant" in the first place. *Crane v. Johnson*, 783 F.3d 244, 249 (5th Cir. 2015); see *Reno v. AADC*, 525 U.S. 471, 483 (1999) (noting that the Executive Branch has the "discretion to abandon" the process "[a]t each stage").

Regardless of whether applicants for admission receive final executable expedited removal orders, demonstrate a credible fear and pursue relief or protection from removal, or are placed into full removal proceedings under section 1225(b)(2)(A), section 1225(b) provides that they "shall be detained" for those

---

[1] Under "expedited removal" procedures, certain noncitizens who lack valid entry documentation or make material misrepresentations shall be "order[ed] . . . removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i); *see id.* § 1182(a)(6)(C), (a)(7); *see also Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1964-67 (2020) (discussing expedited removal).

[2] Section 1229a removal proceedings provide more extensive procedures than expedited removal, *compare* 8 U.S.C. § 1229a *with id.* § 1225(b)(1), including a right to appeal to the Board of Immigration Appeals (BIA) and a federal court of appeals. *Id.* § 1252(a)(1).

procedures. 8 U.S.C. §§ 1225(b)(2)(B)(ii), (b)(2)(B)(iii)(IV), (b)(2)(A). But these detention provisions are implicated only if and when DHS exercises its prosecutorial discretion in the first instance to charge a particular noncitizen with inadmissibility and seek their removal. *See Arizona v. Biden*, 40 F.4th 375, 391 (6th Cir. 2022). DHS lacks "an[y] obligation to take a noncitizen into custody, or keep them in custody, if they decide at that point or later on not to bring an enforcement action." *Id*. Further, because "common sense" dictates that law enforcement officers retain "discretion, even in the presence of seemingly mandatory legislative commands," interpreting a provision using the term "shall," to be "a true mandate [to charge and detain all applicants for admission] … would require some stronger indication" in the legislation. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005). Section 1225(b) provides no "stronger indication" that this use of "shall" creates a judicially enforceable detention mandate. *See Arizona*, 40 F.4th at 391 ("[T]he use of "shall" does not automatically create a judicially enforceable mandate, especially when criminal or civil law enforcement is at issue.").

Even apart from DHS's inherent prosecutorial discretion, the interlocking provisions of the INA dealing with applicants for admission—sections 1225(b)(1) and (b)(2)—afford DHS discretion to grant parole to applicants for admission "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Courts have recognized that promoting public health and

preventing the spread of serious diseases, especially in detention settings, constitutes a significant public benefit. *See, e.g.*, *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (identifying the promotion of "public health" as a "significant public interest[]"); *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020) (noting "it doubtlessly advances the public interest to stem the spread of COVID-19"); *Jones v. Wolf*, 467 F. Supp. 3d 74, 94 (W.D.N.Y. 2020) (noting "the public interest in ensuring public health is also best served by the petitioners' being confined in conditions that do not pose a substantial risk of their contracting" serious illness). Parole is generally permissible for arriving aliens and other applicants for admission subject to expedited removal "whose continued detention is not in the public interest" as determined by DHS officials, provided they do not present a national security, public safety or flight risk. 8 C.F.R. §§ 212.5(b)(5), 235.2(c), 235.3(b)(2)(iii), 235.3(b)(4)(ii).

Parole has been offered on a programmatic basis, to various groups united by a common urgent humanitarian interest or significant public benefit (so long as parolees individually still meet the section 1182(d)(5)(A) standard) for decades: Orderly Departure Program, 1980-1999 (Vietnamese nationals); Moscow Lautenberg Parole Program, 2000-2011 (religious minorities from the former Soviet Union, Estonia, Latvia, or Lithuania); Iraqi Kurds program, 1996-97; Visa Waiver Program, April–October 2000; Haitian Orphan Parole Program, January–April

2001; Cuban Family Reunification Program, 2007–present; Cuban Medical Professional Program, 2006–2013; Cuban Attached Family Members of Refugees program, 2007–2014; CNMI and Guam Parole Programs, 2009 – present; and Central American Minors Program, 2014-18, 2021 – present. *See, e.g.*, Written Testimony of Joseph Langois to Senate Subcomm., U.S. Dep't of Homeland Sec., Apr. 23, 2015, https://www.dhs.gov/news/2015/04/23/written-testimony-uscis-senate-judiciary-subcommittee-immigration-and-national; Shalini Bhargava Ray, *The Emerging Lessons of* Trump v. Hawaii, 29 Wm. & Mary Bill Rts. J. 775, 795 (2021) (discussing cases challenging programmatic humanitarian parole rescissions "on a mass scale") (citing Alison Kamhi et al., *Parole In Immigration Law* § 1.1 (1st ed. 2016)).

Factual and Procedural Background. On May 10, 2023, based on a statement reported in media that Defendants were going to employ a "targeted use of parole [to] allow Border Patrol to focus its resources most effectively [on] quickly process[ing] and remov[ing] individuals who do not have a legal basis to remain in the country," ECF No. 1 ¶ 27 (alterations in original), Plaintiff filed the instant suit, alleging this "targeted use of parole" initiative violated the APA. ECF No. 1. Florida alleged three claims: Defendants' action was contrary to law (Count 1), arbitrary and capricious (Count 2), and was required to but failed to undergo notice and comment rulemaking.

On May 10, 2023, Border Patrol Chief Raul Ortiz signed a memorandum titled "Policy on Parole with Conditions in Limited Circumstances Prior to the Issuance of a Charging Document (Parole with Conditions)." (Parole With Conditions Policy, Ex. A.) The May 10, 2023 memorandum outlines exigent border-overcapacity circumstances when Border Patrol may utilize DHS's longstanding parole authority under section 1182(d)(5)(A) to temporarily parole noncitizens, who have been inspected, vetted, and checked for national security concerns, on a case-by-case basis for urgent humanitarian reasons or for significant public benefit, prior to the issuance of a charging document where that parole is conditioned on a noncitizen, within 60 days, scheduling an appointment to appear at an U.S. Immigration and Customs Enforcement (ICE) facility at a date in the future for the initiation of appropriate removal proceedings or requesting service, via a designated online location, of a Notice to Appear (NTA) by mail. Ex. A. When the limited exigent circumstances concerning overcapacity outlined in the memorandum exist, use of Parole With Conditions permits CBP to maintain adequate enforcement resources (which would otherwise be focused on processing and issuing NTAs to applicants for admission) along the border to deter the efforts of criminal organizations and traffickers and intercept persons seeking to enter the United States unlawfully, and to prioritize the health and safety of individual noncitizens in its custody through reducing overcrowding. *Id.* It also allows Border Patrol to maintain safe and humane holding

conditions, compliant with all applicable court orders and other legal obligations, for each noncitizen in its custody. *Id.* Parole With Conditions may only be used on a temporary, sector-specific basis where Border Patrol agents determine, on "a case-by-case individualized basis, examining all of the facts and circumstances at the time of the noncitizen's inspection," that "there are urgent humanitarian reasons that warrant parole of [that] particular person, given the health and safety of individuals in custody, or that there is significant public benefit in paroling the particular person in order to allow for [Border Patrol] to continue to process those it has in its custody or utilize its limited personnel to process and maintain border security." *Id.* The grant of Parole with Conditions is for a specific period, generally 60 days, and the parole automatically terminates upon the expiration of that period. *Id.*

The May 10, 2023 memorandum carefully outlines the considerations and scope of the case-by-case evaluations of prospective parolees under this program:

> Prior to a noncitizen's processing via Parole with Conditions, CBP must conduct biometric identity verification. The BPA making determinations regarding Parole with Conditions must evaluate any potential national security and public safety concerns. Any assessment must consider all of the facts and circumstances known to the BPA at the time, including but not limited to, the noncitizen's immigration history, criminal history, community or family ties, medical concerns, role as a caregiver or provider, and other factors known to the BPA. The assessment may begin as early as the initial encounter in the field, and there is no limitation on the time period in which this individual evaluation must occur. BPAs must make determinations about national security and public safety based on the facts and circumstances known at the time of processing.

In addition, the BPA must consider whether, given the time the individual has been in custody, and the availability of ICE detention space, there is an urgent humanitarian reason or significant public benefit to parole the individual from custody, such as where a noncitizen has medical, mental health, or other care needs that cannot reasonably be provided in USBP custody given the prolonged time in custody due to encounter numbers. Additionally, because BP personnel and resources are finite, BP must consider whether processing personnel and resources are necessary to process other noncitizens in BP custody or accomplish enforcement actions that are immediately critical to border security for the greater public benefit. If so, the individual may be considered for Parole with Conditions

Ex. A.

Parole With Conditions comes in response to a moment of crisis at the border. DHS has taken many far-reaching actions to decrease processing times during periods of high encounters at the border, including detailing more personnel to the border, standing up additional processing facilities, leveraging technology to reduce processing time and digitize A-files, and called in the assistant of other DHS components and employees, and even Department of Defense troops. Declaration of Matthew J. Hudak at ¶¶ 6-7 (Exhibit B). Nevertheless, encounters remain at a historic high. *Id*. ¶ 8. As of May 9, 2023, Border Patrol is holding more than 27,000 noncitizens in custody, which is over capacity in eight of nine Southwest border sectors. *Id.* Border Patrol is on pace to surpass the 2.1 million encounters recorded in Fiscal Year (FY) 2022. During FY23 to date, Border Patrol has encountered approximately 1.4 million noncitizens. *Id.*

The lifting of the Centers for Disease Control and Prevention's Title 42 Public Health Order (Title 42) is expected to lead to a further surge in migrants, with number of encounters predicted at an average of 12,000-14,000 noncitizen per day. *Id.*

At the current operational pace, and without any additional measures such as Parole with Conditions, USBP would have over 45,000 individuals in custody by the end of the month. *Id.* ¶ 9. Further, the DHS Chief Medical Officer has concluded that "current conditions pose an increased risk of adverse health outcomes." *Id.* ¶ 13. Overcrowding and increased movement of noncitizens between facilities has the potential to result in adverse health outcomes, including the spread of communicable diseases (e.g., Measles, Varicella, etc.) among noncitizens held in these facilities. *Id.*

Based on these conditions, "a court order determining that CBP cannot release individuals from BP custody would" "exacerbate already very seriously concerning holding conditions, likely force operational conditions that causes CBP to violate [other] court orders ..., and have extremely dire and catastrophic consequences." Ex. B at 18.

Florida moved for a temporary restraining order on May 11, 2023. ECF No. 2. Florida requests equitable relief "preventing DHS from implementing the new parole policy or otherwise using § 1182(d)(5) as a tool of operational convenience, to relieve overcrowding, or to facilitate faster processing at the Southwest border."

*Id.* at 11. Florida also requests the Court to "set a briefing schedule for preliminary relief and order DHS to provide weekly status reports regarding Border Patrol's use of the parole authority in § 1182(d)(5)." *Id.*

## ARGUMENT

To obtain preliminary equitable relief, Florida must affirmatively demonstrate: "(1) substantial likelihood of success on the merits; (2) [that] irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to [him] outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). In the Eleventh Circuit, "a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir. 2000). A TRO or PI should be denied because Florida cannot make this showing: its claims lack merit and its injury does not outweigh the damage its requested relief would impose on the United States.[3]

### I. Florida Cannot Obtain APA Review of Its Claims.

---

[3] The balance of equities and public interest factors merge when the Government is the defendant. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## A. Committed to agency discretion by law.

The use of parole under Parole With Conditions is committed to agency discretion by law and thus unreviewable under the APA. 5 U.S.C. § 701(a)(2).

The choice whether and when to charge a noncitizen for removal, and whether to detain them while that determination is being made, are the type of enforcement decisions "generally committed to an agency's absolute discretion." *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Such decisions "often involve[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including "whether agency resources are best spent on this violation or another … and, indeed, whether the agency has enough resources to undertake the action." *Id.* Both the decision whether and when to issue charging documents for removal proceedings, and the decision to detain or release pending those proceedings, in addition to implicating resource allocation considerations, also require balancing "whether agency resources are best spent on [enforcing] this violation [of the immigration laws] or another." *Heckler*, 470 U.S. at 831. These considerations are exactly the kind Congress has committed to agency discretion. *Id.* Indeed, the determination to detain or release on parole encompasses, *inter alia*, discretionary considerations relying on agency expertise and resource prioritization, difficult for a court to review, such as "the possibility that [a noncitizen] may abscond to avoid being returned to his or her home country," "priorities for the use

of limited detention space," and of course, the statutory requirements that parole be for "urgent humanitarian reasons or significant public benefit." *See Jeanty v. Bulgar*, 204 F. Supp. 2d 1366, 1382 (S.D. Fla. 2002); 8 U.S.C. § 1182(d)(5)(A).

Nor does section 1225(b) require DHS to detain all amenable applicants for admission. Although section 1225 uses the word "shall," the Supreme Court has instructed that the "deep-rooted nature of law-enforcement discretion" persists "even in the presence of seemingly mandatory legislative commands." *Town of Castle Rock*, 545 U.S. at 761. In any event, nothing in the statute evinces a "strong[] indication" of intent to impose a "true [detention] mandate" on the Executive. *Id.*; *accord, Arizona*, 40 F.4th at 391. If anything, the opposite is true, because of the INA's provision of release on parole under section 1182(d)(5)(A) for section 1225(b) detainees. *See MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co.*, 950 F.3d 764, 776 (11th Cir. 2020) (court looks at statutory text in "relation to other provisions in the Act" to determine its meaning).

And parole is inherently discretionary, *see* 8 U.S.C. § 1182(d)(5)(A), further indicating that the structure of the INA commits the release decisions Plaintiff challenges to agency discretion. "Congress has delegated remarkably broad discretion to executive officials under the [INA]" and its grants of authority "are nowhere more sweeping than in the context of parole." *Garcia-Mir v. Smith*, 766 F.2d 1478, 1484 (11th Cir. 1985); *see Jean II*, 727 F.2d at 966 & n.8. Further

underscoring the unreviewable discretion inherent in parole, courts lack jurisdiction to review parole and bond decisions under 8 U.S.C. §§ 1226(e), 1252(a)(2)(B)(ii). *See, e.g.*, *Alonso-Escobar v. USCIS Field Off. Dir. Miami, Fla.*, 462 F. App'x 933, 935 (11th Cir. 2012) (unpublished); *Jeanty*, 204 F. Supp. 2d at 1382.

*B. No final agency action.*

Florida additionally cannot obtain APA review because it does not challenge "final agency action," 5 U.S.C. § 704. Agency action is final if it determines legal "rights or obligations." *Bennett*, 520 U.S. at 178. Agency action that "does not itself adversely affect" a party but instead "only affects his rights adversely on the contingency of future administrative action" is "nonfinal." *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1237 (11th Cir. 2003).

The Parole With Conditions is not final agency action because it does not finally determine anyone's rights or obligations. The program does not require CBP agents to take any specific action; it neither imposes an obligation to detain or release a noncitizen, nor does it grant a noncitizen the right to release. Ex. A. The agents and officers retain discretion to detain or parole noncitizens on a "case-by-case basis," and nothing in the guidance mandates a specific result in any circumstance. *Id.* Parole With Conditions does not become final and challengeable until after a decision to detain or release is made in an individual's case. *See Norton*, 324 F.3d at 1237. Because agency officials are "free to exercise discretion" to grant or deny

parole in particular cases, the May 10, 2023 memorandum does not constitute final agency action. *See Jean I*, 711 F.2d at 1481; *Florida v. United States*, 540 F. Supp. 3d 1144, 1157 (M.D. Fla. 2021), *vacated on other grounds*.

## II. Florida Cannot Succeed on the Merits

*A. Count I (Contrary to Law)*

Parole With Conditions represents a valid use of DHS's parole authority under section 1182. Section 1182(d)(5)(A) provides that the Secretary of Homeland Security may

> in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A).

The May 10, 2023 memorandum is consistent with this provision. The memorandum provides that Parole With Conditions may only be granted on a case-by-case basis to individual noncitizens for urgent humanitarian reasons or significant public benefit. Ex. A. The memorandum provides that the individualized inquiry must consider both the individual's identity, public-safety and flight-risk factors as

well as whether there is an urgent humanitarian interest or significant public benefit relevant *to that individual*. Ex. A.

In enacting section 1182(d), Congress did not define the terms "urgent humanitarian reasons or significant public benefit," thus delegating to the agency the role of adjudicating these terms. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 842 (1984); *see also New Mexico*, 450 F. Supp. 3d at 1175 n.5 (Section 1182(d)(5)(A)'s "vague standard conceivably encompasses a wide range of public benefits"). The May 10, 2023 memo provides that possible urgent humanitarian interests or significant public benefits that Border Patrol agents may find, on an individual basis, to just release on parole include "such as where a noncitizen has medical, mental health, or other care needs that cannot reasonably be provided in USBP custody given the prolonged time in custody due to encounter numbers," or where "processing personnel and resources are necessary to process other noncitizens in BP custody" of higher priority than that individual "or accomplish enforcement actions that are immediately critical to border security for the greater public benefit." Ex. A. These applications of the section 1182(d)(5) standard are reasonable and entitled to deference. *See INS v. Aguirre-Aguirre,* 526 U.S. 415, 424-425 (1999) (further noting "judicial deference to the Executive Branch is especially appropriate in the immigration context"). The need to prevent disease and other health and safety concerns created by overcrowding in congregate settings

is roundly recognized as a significant public benefit, *see, e.g.*, 8 C.F.R. § 212.5(b)(1) (providing parole for noncitizens with "serious medical conditions in which continued detention would not be appropriate"); *Grand River Enterprises Six Nations, Ltd.*, 425 F.3d at 169; *Swain*, 961 F.3d at 1293, and regulations applying the parole authority in a parallel context have long recognized that paroling noncitizens whose detention is not in the public interest due to the need to prioritize agency enforcement reasons is a significant public benefit, *see* 8 C.F.R. § 212.5(b)(5). Indeed, where Border Patrol agents must be detailed to processing rather than policing the border, they will be less able to promote public safety by apprehending noncitizens seeking to enter illegally, including, for example "those linked with terrorist organizations, those with criminal records, smugglers," and "those actively trafficking other members of the same group (which could include children)." Ex. B, ¶ 15.

Because the May 10, 2023 memorandum requires that Border Patrol agents comply with the requirements of section 1182(d)(5)(A) by conducting a sufficient case-by-case inquiry, ensuring there is an urgent humanitarian interest or significant public benefit justifying this particular application of the parole authority, and ensuring that any grant of parole terminates on a definitive date when its purposes will have been served, Parole With Conditions is fully consistent with section 1182(d)(5)(A) and not contrary to law.

Florida argues that this policy flouts the Court's ruling on Parole+ATD and otherwise is contrary to law for the reasons articulated by the Court in vacating that program on March 8, 2023. *See Florida v. United States*, No. 3:21-cv-1066-TKW-ZCB, ECF No. 157 (N.D. Fla. Mar. 8, 2023). However, that order did not preclude DHS from using its parole authority in other ways, and Parole With Conditions different from Parole+ATD in critical ways relevant to the Court's determinations that the latter was not consistent with section 1182(d)(5)(A).

*First*, unlike Parole+ATD, which did not specify an endpoint to the grant of parole once its purposes had been served, Parole With Conditions provides that the grant of parole must be specified to terminate at a time certain, generally to be 60 days. Ex. A. Thus, the parole will terminate when DHS has determined that "the purposes of such parole … shall have been served," 8 U.S.C. § 1182(d)(5)(A), namely that the particular urgent humanitarian interest or significant public benefit deemed to justify that individual's release—be it to respond to medical concerns and avoid health issues due to overcapacity in Border Patrol holding facilities, or the need to prioritize Border Patrol personnel resources from fully processing for an NTA this individual to be able to police the border against particular criminal and

security threats—will have been served by their parole from Border Patrol custody for subsequent completion of their NTA processing.[4]

*Second,* Parole Plus Conditions is much clearer than the Parole+ATD memorandum in its requirement for a thorough individualized consideration prior to releasing the individual on parole. Unlike with Parole+ATD, the May 10, 2023 memorandum makes clear that there "is no limitation on the time period in which this individual evaluation must occur." Ex. A at 5. Border Patrol agents must take as long as necessary, beginning potentially "as early as the initial encounter in the field," to "conduct biometric identity verification" and "evaluate any potential national security and public safety concerns," considering "all of the facts and circumstances known to the [agent] at the time, including but not limited to, the noncitizen's immigration history, criminal history, community or family ties, medical concerns, role as a caregiver or provider," and other relevant factors. *Id.*

Further, as explained further immediately *infra*, the individualized inquiry does not solely "focus[] on whether the alien is a public safety risk or flight risk,"

---

[4] Florida criticizes the Parole With Conditions memorandum on the assumption that it does not specify that noncitizens will automatically be taken back into custody when that specific period of parole terminates. However, the memorandum provides that U.S. Immigration and Customs Enforcement (ICE) "will make a separate, independent determination, after processing the individual for appropriate removal proceedings, whether to release the individual on parole during the pendency of such proceedings." Ex. A at 6. However, ICE lacks the capacity to detain all of the millions of noncitizens in removal proceedings, as the Court recognized in *Florida*. ECF No. 157 at 38 ("The evidence establishes that Defendants do not have sufficient detention capacity to detain all arriving aliens[.]"). Moreover, Defendants can only return individuals to Mexico under 8 U.S.C. § 1225(b)(2)(C) to the extent Mexico permits it.

but also requires that the Border Patrol agent determine that substantive component of section 1182(d)(5) is met with respect to that individual. *See Florida*, ECF No 157 at 92. That is, the agent must determine there is an urgent humanitarian interest or significant public benefit present due to a specific humanitarian interest or public benefit pertaining to that individual and relevant to that specific point in time.

*Third,* Florida is incorrect in its assumption that release on Parole With Conditions will violate the requirement of having an urgent humanitarian interest or significant public benefit by blanketly creating "a new processing pathway." Unlike with the Parole+ATD memorandum, the May 10, 2023 memorandum specifies a number of potential urgent humanitarian interests or significant public benefits that may justify parole for individual noncitizens, depending on their particular circumstances, such as, for example, "where a noncitizen has medical, mental health, or other care needs that cannot reasonably be provided in USBP custody given the prolonged time in custody due to encounter numbers." Ex. A at 5. The same urgent humanitarian interest or significant public benefit will not apply in a blanket fashion to every noncitizen being paroled under the policy, nor permit release of every noncitizen encountered in a sector at a given time on a mass scale "merely for sake of administrative expediency." *Florida*, ECF No. 157 at 95. Rather, each parole decision under this policy must be justified by humanitarian or public-interest factors

relevant to that individual and the specific circumstances of their detention by Border Patrol under the conditions existing at that time.

Further indicating that Parole With Conditions is not an open-ended new processing pathway as Florida claims, the May 10, 2023 memorandum makes clear that once capacity in a sector experiencing the exigent overcrowding that triggers the availability of consideration for Parole With Conditions falls back below 95%, Parole With Conditions should not be utilized and "concerns regarding health and safety of noncitizens in short-term custody" in particular are less likely to be present. Ex. A at 4. The May 10 memorandum "emphasizes that even where a Sector has been approved to utilize the Parole with Conditions pathway that it must use it sparingly and only after a case-by-case determination for each individual alien. Such approval in no way permits blanket paroles from a Sector." Ex. B ¶ 11.

Contrary to Florida's assumption about this use of parole, Parole With Conditions utilizes section 1182(d)(5)(A) neither "as a tool of operational convenience" or merely "to facilitate faster processing at the Southwest border," and permits release stemming from overcrowding only to the extent that the overcrowding is accompanied or contributes to specific urgent humanitarian interests or significant public benefits applicable on an individual basis. The May 10, 2023 memorandum is thus consistent with the language of the statute and the Court's explanation of that language in the context of Parole+ATD in *Florida*.

*B. Count II (Arbitrary and Capricious)*

The May 10, 2023 memorandum is not arbitrary and capricious. The standard for showing a decision to be arbitrary and capricious is extremely deferential to agency decision-making. *See Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Engineers*, 87 F.3d 1242, 1246 (11th Cir. 1996). The courts cannot second guess an agency's thought process "as long as its conclusions are rational." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009). The "court is not to substitute its judgment for that of the agency" and should still "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

Parole With Conditions is not arbitrary and capricious because it represents a clearly rational response using the agency's available legal tools to respond to dire concerns presented by historic overcapacity at the Southern border: namely, the urgent health and other concerns that can be caused by overcrowding in border holding facilities and the significant threats to public safety that can arise when Border Patrol is unable to devote sufficient resources to policing the border and preventing the unlawful entry of criminal entities due to the need to have its agents completing NTA processing for oftentimes low-threat applicants for admission. Further, the May 10, 2023 memorandum reflects DHS's attempts, to the extent

materially possible, to respond to and adapt its operations in response to the court's criticism of prior parole uses.

Florida's only argument that the May 10, 2023 memorandum is arbitrary and capricious is that it is merely Parole+ATD relabeled. But, in fact, the policy is a different use of DHS's statutory parole authority, for the reasons explained above. Parole With Conditions, further, is meaningfully different from Parole+ATD on the three bases in which the Court held the latter program violated section 1182(d)(5)(A). First, the May 10, 2023 memorandum requires that grants of parole have definite termination points to ensure the parole terminates once the particular urgent humanitarian interest or significant public benefit attendant to that noncitizen's condition and circumstances surrounding their encounter at the border are no longer present. Second, the memorandum makes clear that there is no time limit on the individualized inquiry, and that the case-by-case inquiry must address not just identity, public safety and flight risk factors, but whether the substantive "urgent humanitarian interest or significant public benefit" standard of section 1182(d)(5)(A) is met with respect to that individual and the circumstances at the time of their inspection. Third, the memorandum does not authorize mass release based on a blanket interest in "administrative expediency" that applies sector- or border-wide, *Florida*, ECF No. 157 at 95, but rather specifies a range of particular, long recognized bases for finding an urgent humanitarian interest or significant public

benefit, and requires that Border Patrol agents determine that there is an applicable urgent humanitarian interest or significant public benefit justifying that individual's release from custody. Ex. A at 5.  The May 10, 2023 memorandum thus indicates that DHS considered all relevant factors, including the Court's identification of issues with Parole+ATD, in attempting to craft a response to exigent overcapacity circumstances at the border, and does not represent arbitrary and capricious decisionmaking.

### C. Count III  (Notice and Comment)

Plaintiff incorrectly claims that the May 10 memorandum was required to undergo notice-and-comment rulemaking. TRO at 8-9. However, the Parole Plus Conditions guidance is not the type of rights-creating document that requires notice and comment rulemaking.  Instead, it is an interpretive rule or a general statement of policy.  In any event, good cause excuses notice and comment in the emergency circumstances presented here.

**(a) Notice and comment rule making does not apply because Parole Plus Conditions is an interpretative rule or statement of general policy.**

The notice-and-comment rulemaking requirement does not apply to "interpretative rules" or "general statements of policy." 5 U.S.C. § 553(b)(A); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Unlike legislative rules, interpretive rules "simply state[] what the administrative agency thinks the statute

means." *Warshauer*, 577 F.3d at 1337. Such guidance does not create rights or duties but merely "remind[] affected parties of existing duties." *Id*. The difference "likely turns on how tightly the agency's interpretation is drawn linguistically from the actual language of the statute." *Id*.

Whether an agency pronouncement is a general statement of policy "depends upon whether the agency action establishes a binding norm." *Nat'l Min. Ass'n v. Sec'y of Labor*, 589 F.3d 1368, 1371 (11th Cir. 2009) (quotation omitted). The Eleventh Circuit has explained that "[a]s long as the agency remains free to consider the individual facts in the various cases that arise, then the agency in question has not established a binding norm." *Id*.

Rules of "agency organization, procedure, or practice" are also exempt from the notice and comment requirement. 5 U.S.C. § 553(b)(A); *see Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014).

The May 10 memorandum is an interpretive rule or a general statement of policy because it offers guidance that directly tracks the language of the parole statute, section 1182(d)(5)(A): release on Parole With Conditions may only be granted "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." Exhibit A. The May 10 memorandum does not create any rights or duties for DHS or noncitizens, and the guidance does not expand the use of parole beyond the confines permitted under the statute. *See Warshauer*, 577 F.3d at 1337.

Rather, the May 10 memorandum provides that DHS's determination of an "urgent humanitarian reason" or "significant public benefit" can include considerations of health and safety where overcrowding conditions are present and "USBP' s continued ability to carry out its critical border security and enforcement mission." Ex. A at 2, 5. Thus, the May 10 memorandum is at most an interpretive rule. Additionally, it may be viewed as a general policy statement, as it does not establish a binding norm, because the agency remains free to consider facts in individual cases and requires sector-specific assessments as to whether to continue to authorize Parole Plus Conditions. Ex. A at 3-5; *see Nat'l Min. Ass'n*, 589 F.3d at 1371.

Indeed, mirroring the parole statute, the procedures outlined in the May 10 memorandum are applied "on a case-by-case basis" depend on whether "there is an urgent humanitarian reason or significant public benefit to parole" and provide no assurance that parole will be granted in any specific case. *Id*. at 5 & 6. Rather, the May 10 memorandum falls within the longstanding rule that agency policies or procedures that inform the public of the agency's current policy regarding enforcement and use of discretionary authorities (here, the parole authority) are general statements of policy. *See, e.g.*, *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 509 (9th Cir. 2019) (explaining that the agency policy which directed immigration officers to consider whether they "may return" a noncitizen to Mexico pending removal proceedings was a statement of policy "because immigration

officers designate applicants for return on a discretionary case-by-case basis"), *stay granted*, 140 S. Ct. 1564 (2020); *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 597 (5th Cir. 1995) (similar, in context of FDA guidance concerning enforcement actions). In short, the May 10 memorandum merely "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (citation omitted).

Alternatively, the May 10 memorandum qualifies as a rule of "agency organization, procedure, or practice." 5 U.S.C. § 553(b). "Procedural rules," the general label for rules falling under this exemption, are "primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties." *Mendoza*, 754 F.3d at 1023 (quotation omitted); *see also Texas v. United States*, 50 F.4th 498, 522 (5th Cir. 2022) (looking at "whether the rule (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion"). Parole Plus Conditions is aimed at allowing BP to fulfil its mission and addressing current and anticipated increases in overcrowding and detention facilities. Ex. __ at 3-4; Ex. B. The May 10 memorandum identifies circumstances for the consideration of parole authority without changing the substantive rights of the affected noncitizens or third parties. *See Mendoza,* 754 F.3d at 1023. Further, the utilization of Parole Plus Conditions does not alter the "the substantive criteria by which" DHS

will "approve or deny" a parole request or an ultimate claim for relief. *James v. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 281 (D.C. Cir. 2000).

Under any scenario, the May 10 memorandum does not promulgate a substantive, rights-altering rule and consequently was not required to undergo notice and comment.

### (b) Good Cause Excuses Compliance With Notice and Comment.

For the reasons stated above 5 U.S.C. § 553 does not apply to the Parole Plus Conditions laid out in the May 10 memorandum. But even if it did, BP was within its authority to forego notice and comment here for good cause. Section 553 permits an agency to forego notice and comment "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." § 553(b)(3)(B). "Emergencies, though not the only situations constituting good cause, are the most common" reason for forgoing notice and comment. *U.S. v. Dean*, 604 F.3d 1275, 1281 (11th Cir. 2010). An "emergency situation" includes those where notice and comment would pose "a possible imminent hazard to [] persons, and property within the United States," *Jifry v. FAA,* 370 F.3d 1174, 1179 (D.C. Cir. 2004). In short, although the good cause exception must be used sparingly, it is "an important safety valve to be used where delay would do real harm." *Dean,* 604 F.3d at 1279.

Here, compliance with notice and comment rule making would prevent BP from effecting its central mission—patrolling the nation's borders and apprehending those who cross the border between ports of entry. BP explained in the May 10 memorandum that "situations in certain sectors are quickly evolving into exigent circumstances, constituting good cause for bypassing notice and comment rulemaking, as contrary to the public interest." Ex. A at 7. The details of this exigency and the exigent situation facing BP—given their physical capacity limitations, staffing limitations, and budgetary limitations—are set forth in the accompanying declaration of Matthew J. Hudak.

As this Court is aware, Title 42—the Centers for Disease and Control's health measure, which previously permitted BP to expel migrants without an ability to seek asylum—expires tonight. Knowing Title 42 was set to expire, DHS took a number of measures to address the anticipated migrant surge at the border. *See* Hudak Decl. at ¶ 6. Those measures included (i) digitizing A-files to permit faster review and processing times, *id*. at ¶ 6a, (ii) improving mobile intake capabilities through CBP Mobile devices that replace the paper field intake forms used by USBP to document biographical data from the non-citizens encountered, *id*. at ¶ 6b, (iii) moving employees to the border to assist with non-law enforcement support activities, *id*. at ¶ 6c, (iv) engaging with virtual and mobile processing technologies such as laptops, *id*. at ¶ 6d, (v) engaging Border Patrol Processing Coordinators (BPPC), who are not

immigration officers but are employed by Border Patrol, to perform administrative tasks to speed up processing times, *id*. at ¶ 6e, (vi) streamlined the processing of Notices to Appear/ Order of Own Recognizance, *id*. at ¶ 6 f, (vii) redistributing Office of Field Operations ("OFO") officers to assist BP, *id*. at ¶ 6g (viii) building soft sided holding capacity to permit the processing of more noncitizens. *Id*. at ¶ 8. In addition to these steps, DHS has also implemented other policies to seek to minimize the flow of traffic at the southwest border. In addition, DHS had had conversations with the Government of Mexico, and Mexico currently is not accepting any returns under the Migrant Protection Protocols (MPP).

Notwithstanding these efforts, there are an unprecedented number of migrants at the border who will seek entry to the United States upon the expiration of Title 42. Meanwhile, BP stations are already at capacity. As of May 9, 2023, USBP is holding more than 27,000 noncitizens in custody. *See* Hudak Decl. at ¶ 10. This is overcapacity in eight of nine SWB sectors. Currently, the USBP is on pace to surpass the 2.1 million encounters recorded in Fiscal Year (FY) 2022. During FY23 to date, USBP has encountered approximately 1.4 million noncitizens. The lifting of the Centers for Disease Control and Prevention's Title 42 Public Health Order (Title 42) is expected to lead to a further surge in migrants, with number of encounters predicted at an average of 12,000-14,000 noncitizen per day. *Id.* For the past 7 days, BP has averaged over 8,750 encounters per day, double the average daily encounters

in May of 2019, the highest month of the 2019 surge. Ex. A at 7. When Title 42 is lifted, the migrants along the border who cross into the United States will have the lawful ability to claim asylum, and the government, by statute, will have to consider those claims. 8 U.S.C. § 1225. BP does not have the staff available, or the space available, to issue Notices to Appear—the charging document in immigration cases—to each of the individuals expected to arrive at the border in the coming days and weeks, while simultaneously continuing to patrol the border. At the current operational pace, and without any additional measures such as Parole with Conditions, USBP would have over 45,000 individuals in custody by the end of the month. *See* Hudak Decl. Border Patrol is not resourced to manage the level of encounters currently occurring across the Southwest Border, and the U.S. Congress provided less than half of the $4.9 billion that DHS requested to prepare for the lifting of Title 42. *Id.* To be clear, while DHS continues to explore options for dealing with the surge at the Southwest border, at the present time, if conditions remain as they are, and had DHS not issued the Parole Plus Conditions and instead engaged in notice and comment, BP would have had no choice but to decline to apprehend noncitizens crossing the border or initiate removal proceedings against them in sectors with insufficient capacity to comply with the court's order. *See* Hudak Decl. at ¶¶ 17, 21. In the absence of other options, and facing the imminent

termination of Title 42, BP must do something, and Parole Plus Conditions provides a short term solution to the emergent conditions faced at the Southwest border.

An agency has good cause to waive notice and comment where "an imminent, externally imposed deadline or the existence of an emergency" created urgency to promulgate the rule, *Paucar v. Att'y Gen. of U.S.*, 545 F. App'x 121, 125 (3d Cir. 2013), as is the case here. As set forth above, an agency also has good cause to forgo notice and comment when doing so is necessary to "carry out its mission," as is the case here, Ex. A at 7. *Riverbend*, 958 F.2d at 1484. In short, the emergency posed by the termination of Title 42 and the surge in migration justify an exception to notice and comment here. *See Wall v. Centers for Disease Control & Prevention*, No. 6:21-CV-975-PGB-DCI, 2022 WL 1619516, at *10 (M.D. Fla. Apr. 29, 2022) (Covid 19 emergency justified foregoing notice and comment of mask mandate and travel testing rules).

Consistent with these principles, BP recognized that pre-promulgation notice and comment was impossible because "certain sectors are quickly evolving into exigent circumstances," Ex. A at 7, and with migration at historic levels for the past seven-days and the imminent end to Title 42, the "situation requires urgent action." *Id.*

## II.  The Balance of Equities Opposes Injunctive Relief.

A TRO would irreparably harm the United States and the public by frustrating

measures DHS has adopted that are necessary to address an expected significant increase in noncitizens arriving in the coming days. DHS has identified an imminent crisis at the southwest border—record numbers of noncitizens seeking to enter our country, overwhelming the immigration system—and has planned to use all authority at its disposal to address this crisis. But that authority is limited. Outside of narrow exceptions, DHS cannot return noncitizens arriving from other countries to Mexico, and certainly cannot do so in numbers that would alleviate the pressure on the border. Nor does DHS have the resources to either detain this record number of arrivals, or the staffing and facilities to safely process and issue charging documents to all these new arrivals in the normal course. With detention or return of these noncitizens being impossible, and normal processing impossible in a safe or orderly manner that would not lead to dangerous overcrowding and attendant risks to health, safety, and security of both migrants and immigration officials, the relief Florida seeks—barring DHS from using its statutory parole authority under § 1182(d)(5), Mot. at 11—would leave the agency with no options.

Put simply, "a court may not require an agency to render performance that is impossible." *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 167-68 (D.C. Cir. 2017); *see also Ala. Power Co. v. Costle*, 636 F.2d 323, 359 (D.C. Cir. 1979); *NRDC v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1974). Indeed, "[i]t has long been settled that a federal court has no authority ... to declare principles or rules of law which cannot affect the

matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (citation omitted). In "contemplating the equities," a Court cannot "order a party to jump higher, run faster, or lift more than she is physically capable." *Am. Hosp. Ass'n*, 867 F.3d at 167-68.

Florida requests that the Court "enter a temporary restraining order preventing DHS from implementing the new parole policy or otherwise using § 1182(d)(5) as a tool of operational convenience, to relieve overcrowding, or to facilitate faster processing at the Southwest border." Mot. at 11. But Florida offers no explanation for how this is possible in the context of the imminent influx in arrivals. Simply removing statutory authority Congress provided DHS to use parole would, in these circumstances, risk the safety of border officials and migrants, and risk overwhelming border facilities and the security of the border itself.

As for its own harm, Florida raises financial costs related to noncitizens Florida anticipates may over time travel to Florida and use State services or benefits. Mot. at 5. Whatever weight the Court may give those allegations of future harm, they cannot be avoided by granting relief that would be extremely challenging for DHS to comply with, nor can they outweigh the significant and far more imminent harms to safety and border security a TRO would cause. As the Supreme Court has emphasized, challenges to immigration enforcement discretion "invade a special province of the Executive." *Reno v. Am.-Arab Anti-Discrimination Comm.*

("AADC"), 525 U.S. 471, 489 (1999). And here, Plaintiffs challenge the Executive's ability to exercise that discretion not in normal times, but rather its exercise of that discretion to respond to a crisis at the southwest border.

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo,* 456 U.S., 102 S. Ct. 1798, 1803 (1982). By removing one of the few tools DHS has to address this crisis, an injunction would undermine a core Executive function related to managing an international border and cause direct, irreparable injury to the interests of the government and the public, which "merge" in suits against the federal government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## CONCLUSION

For the forgoing reasons, the Court should deny the motion for a temporary restraining order, and at a minimum, allow time for a hearing before issuing any injunctive relief. And if the Court issues injunctive relief, Defendants respectfully request that the Court enter a temporary administrative stay of any order for a reasonable amount of time to allow Defendants to evaluate whether to pursue emergency appellate review.

Date: May 5, 2023

JASON R. COODY
*United States Attorney*

MARIE A. MOYLE
*Assistant United States Attorney*
Northern District of Florida

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

EREZ REUVENI
*Assistant Director*

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
ERIN T. RYAN
ELISSA FUDIM
*Trial Attorneys*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 598-7537
Joseph.a.darrow@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 11, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which provided an electronic notice and electronic link of the same to all attorneys of record.

By: */s/ Joseph A. Darrow*
JOSEPH A. DARROW
Trial Attorney
United States Department of Justice
Civil Division