UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**STATE OF FLORIDA**,

    **Plaintiff**,

v.                                                                                 Case No. 3:23cv9962-TKW-ZCB

**ALEJANDRO MAYORKAS**, et al.,

    **Defendants**.

_____/

## **TEMPORARY RESTRAINING ORDER**

This case is before the Court based on Florida's emergency motion for a temporary restraining order (TRO) (Doc. 2) and Defendants' response in opposition (Doc. 9). No hearing is necessary to rule on the motion, and upon due consideration of the parties' filings and the entire case file, the Court finds for the reasons that follow that the motion is due to be granted.

### Background

The Southwest Border has been out of control for the past 2 years. And it is about to get worse because, at midnight tonight, the Title 42 Order expires.[1]

---

[1] The Title 42 Order allowed immigration officials to turn arriving aliens away at the border without placing them in immigration proceedings or considering their asylum claims. The expiration of the Title 42 Order has been a long time coming because it was put in place by the Center for Disease Control to address public health concerns about COVID-19, and it is common knowledge that the COVID-19 pandemic has been "over" for quite some time. *See Arizona v. Mayorkas*, 143 S. Ct. 478, 479 (2022) (Gorsuch, J., dissenting) (noting that there was no serious

The expiration of the Title 42 Order is expected to result in a "surge" of aliens seeking to enter the country because there are reportedly tens of thousands of aliens staged at the Southwest Border waiting for the Title 42 Order to expire so that they can seek to enter the country. And that is on top of the tens of thousands of aliens that have reportedly crossed the border into the country each day over the past few weeks in anticipation of the Title 42 Order expiring.

The current situation at the border underscores the Court's recent finding that there is an immigration "crisis" at the Southwestern Border. *See Florida v. United States*, 2023 WL 2399883, at *1 (N.D. Fla. Mar. 8, 2023). And, consistent with the Court's finding, President Biden reportedly acknowledged within the past few days that there has been "chaos at the border for a number of years" and warned that the situation at the Southwest Border is going to be "chaotic for a while" after the Title 42 Order expires.

The Biden Administration blames Congress for the immigration crisis and the chaos coming to the border. Congress blames President Biden and his Administration. In the *Florida* decision, the Court pinned much of the blame for the crisis at the border on the "non-detention policies" put in place by the Biden

---

dispute that the public-health justification undergirding the Title 42 orders has lapsed, that "the current border crisis is not a COVID crisis," and that "courts should not be in the business of perpetuating administrative edicts designed for one emergency only because elected officials have failed to address a different emergency").

2

Administration—but the Court noted that it is the responsibility of the political branches (collectively), not the Court, to solve the immigration crisis. *Id.*; *see also id.* at *21 (noting that the Court's job was to merely "to 'say what the law is' … and then let the political chips fall where they may").

The Court hoped that after issuing the decision in *Florida*, it would be able to go back to its normal docket and simply watch the political finger-pointing about the immigration crisis from afar. That, however, was not to be.

Yesterday afternoon, I was randomly assigned a new lawsuit filed by Florida against DHS Secretary Mayorkas, U.S. Border Patrol (USBP) Chief Ortiz, and the United States of America, alleging that "DHS plans to immediately restart the *en masse* parole of aliens at the Southwest Border." Doc. 1 at 2 (¶6) (citing an NBC news article[2] quoting a DHS spokesperson's summary of the plan). Florida claimed that this "new policy" violates this Court's decision in *Florida* that vacated DHS's "Parole+ATD policy" and is contrary to the Immigration and Nationality Act (INA). *Id.* (¶7). Among other things, Florida's complaint asks the Court to declare the new policy unlawful and enjoin DHS from enforcing or implementing it. *Id.* at 9.

This morning, Florida filed an emergency motion asking the Court to enter a TRO "preventing DHS from implementing the new parole policy or otherwise using

---

[2] *Biden admin to allow for the release of some migrants into the U.S. with no way to track them*, https://www.nbcnews.com/politics/biden-admin-plans-order-release-migrants-us-no-way-trackrcna83704 (May 10, 2023 8:44 a.m. CDT).

3

[8 U.S.C.] §1182(d)(5) as a tool of operational convenience, to relieve overcrowding, or to facilitate faster processing at the Southwest border." Florida thereafter filed a copy of the challenged policy with the Court. *See* Doc. 5-1. Defendants were ordered to file a response to Florida's emergency motion on an expedited basis, which they did.

## The Challenged Policy

The policy challenged by Florida in this case is set forth in a memorandum issued by U.S. Border Patrol Chief Raul Ortiz yesterday, titled "Policy on Parole with Conditions in Limited Circumstances Prior to the Issuance of a Charging Document (Parole with Conditions)." The memorandum explains how U.S. Customs and Border Patrol (CBP) will exercise its parole authority under 8 U.S.C. §1182(d)(5) to release arriving aliens into the country "conditioned on [the alien], within 60 days, scheduling an appointment to appear at an U.S. Immigration and Customs Enforcement (ICE) facility for initiation of appropriate removal proceedings or requesting service, via designated online location, of a Notice to Appear (NTA) by mail." *See* Doc. 5-1 at 1.

The memorandum explains that CBP will exercise its parole authority under the policy when "there are conditions requiring the expeditious processing of [aliens] in exigent circumstances in order to ensure (1) appropriate and safe conditions for the health and safety of individual [aliens] in custody and (2) USBP's continued

ability to carry out its critical border security and enforcement mission." *Id.* at 2. The policy states that it is a "tool that should only be used when one of the limited triggers below are met." *Id.* The triggers include processing capacity and time-in-custody thresholds at CBP facilities and periods when there are more than 7,000 apprehensions per day across the Southwest Border. *Id.* at 4.[3]

When those triggers are met, the policy requires an "individual assessment" of the alien for parole eligibility. *Id.* at 5-6. That assessment includes, among other things, a "biometric identity verification," an evaluation of the alien's "immigration background," and "vetting of any national security or criminal concerns." *Id.* at 5. The policy also requires USBP to collect and document a physical address for each alien, *id.* at 6, but it does appear to require any action to verify the legitimacy of the address.

The memorandum states that the parole policy may not be used for aliens who "pose a national security risk, unmitigable flight risk, public safety threat," or who are unaccompanied children. *Id.* at 6. Nor may the policy be used if the alien is subject to the mandatory detention requirements in 8 U.S.C. §1226(c). *Id.*

---

[3] It is noteworthy that the affidavit submitted by Defendants explains that eight of nine sectors are already over capacity and predicts that there will be 12,000 to 14,000 encounters per day over the coming weeks, which suggests that these triggers will be readily met and that use of the challenged policy will be widespread and immediate.

5

The memorandum claims that the aliens "are not simply released into the community" because "they are required to schedule an appointment with ICE for the initiation of … removal proceedings, as appropriate, or, at a designated online location, request service of an NTA by mail," *id.* at 2, but the grant of parole under the challenged policy does not place any restrictions on where the aliens can go or require electronic monitoring or any other safeguard to track the aliens' locations once released into the country. The memorandum states that the "initial" grant of parole "should generally be for 60 days," *id.* at 5, which suggests that there could be circumstances where parole could initially be granted for more than 60 days and/or that the parole could be extended through subsequent grants.

The memorandum states that the purpose of the parole is to "allow[] the [alien] to schedule an appointment to appear at an ICE facility for the initiation of appropriate removal proceedings of an NTA by mail," and it states that the parole is "automatically terminated upon expiration of the period for which parole was authorized." *Id.* The memorandum states that "CBP and ICE will equally share responsibility and work jointly to streamline and complete charging document issuance" for aliens paroled under the policy, *id.*, but it does not explain who is responsible for tracking down any aliens who do not check in with ICE as required as a condition of parole.

The memorandum concludes by asserting that the new parole policy is not subject to notice and comment under the Administrative Procedure Act (APA) because the situation at the border is "quickly evolving into exigent circumstances" and "urgent action" is required based on the "surge" that USBP is experiencing at the Southwest Border over the past week. *Id.* at 6-7. However, the memorandum does not explain how this surge was unexpected or why DHS waited until the day before the Title 42 Order was scheduled to end before issuing the new parole policy.

## Analysis

The Court has authority to issue a TRO under Fed. R. Civ. P. 65.

"A TRO … is appropriate where the movant demonstrates that (a) there is a substantial likelihood of success on the merits; (b) the TRO … is necessary to prevent irreparable injury; (c) the threatened injury outweighs the harm that the TRO … would cause to the non-movant; and (d) the TRO … would not be averse to the public interest." *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001).

A TRO "is an extraordinary and drastic remedy not to be granted unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites," *see United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Authority v. Callaway,* 489 F.2d 567 (5th Cir.1974)), but "the first two factors … are the most critical," *Niken v. Holder*, 556 U.S. 418, 435 (2009); *see also Schiavo*

*ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005) ("The first of the four prerequisites to temporary injunctive relief is generally the most important.").

The Court finds for the reasons that follow that Florida has carried its burden of persuasion.

With respect to the first factor, the Court has no trouble concluding that Florida has a substantial likelihood of success on the merits because the challenged policy appears to be materially indistinguishable from the Parole+ATD policy vacated in *Florida*—both in its purpose (reducing overcrowding at border patrol facilities) and manner of operation (releasing aliens into the country without first issuing a charging document placing them in immigration proceedings and simply directing the aliens to report to ICE within a specified period for further processing).[4] The Court determined in *Florida* that the Parole+ATD policy was final agency action under the APA, that Florida had standing to challenge the policy, and that the policy violated the APA because it was contrary to law, arbitrary and capricious, and adopted without notice and comment.[5] The Court sees nothing materially different

---

[4] One curious difference is that, under the Parole+ATD policy, aliens were given only 15 days to report to an ICE facility to be issued an NTA, but under the new policy, aliens are given four times as long (60 days) to report to an ICE facility. The memorandum adopting the new policy does not explain the rationale for this extended period, and it would seem that the longer the alien is in the country, the greater the chance that he or she will disappear and the more difficult it will be to find him or her for removal proceedings.

[5] Defendants' arguments on these points (Doc. 9 at 15-19, 28-38) largely rehash the arguments that (rightly or wrongly) the Court rejected in *Florida*, and their new argument that "good cause" excuses compliance with notice and comment (*id.* at 32-36) is unpersuasive because

about the new policy or the parties' arguments that would compel a different result with respect to the policy challenged in this case.

One of the fundamental flaws with the Parole+ATD policy is that it did not contemplate that the alien would be returned to custody once the purposes of parole had been served, as required by the plain language of 8 U.S.C. §1182(d)(5). *See Florida*, 2023 WL 2399883, at *29-30. The same appears to be true of the challenged policy, which is primarily intended to relieve overcrowding at border patrol facilities by more quickly releasing aliens into the country for further processing when (or if) they report to an ICE facility. The policy does not contemplate that the alien would be taken into custody at the ICE facility and, as was the case with the Parole+ATD policy, aliens released under the challenged policy would not have an immigration "case" that can "continue to be dealt with" after the purposes of the parole have been served. *Id.* at *30.

---

Defendants have known for quite some time when the Title 42 Order was going to expire and what was likely to happen when it did. *See Florida,* 2023 WL 2399883, at *3 (finding that the encounters at the border "are expected to increase significantly when the Title 42 Order is no longer in place"); *Arizona*, 143 S. Ct. at 479 (Gorsuch, J., dissenting) (noting in an opinion issued in December 2022 that "[e]ven the federal government acknowledges that the end of the Title 42 orders will likely have disruptive consequences") (internal quotations omitted). Moreover, it appears that there was ample time for DHS to go through notice and comment if it wanted to—as it did with the new asylum rules initially noticed in February 2023 and finalized yesterday as part of DHS's strategy to deal with the expiration of the Title 42 Order.

The challenged policy appears to do a better job than the Parole+ATD policy in explaining how it conforms to the "case-by-case" requirement in §1182(d)(5).[6] However, like the Parole+ATD policy, the new policy does not explain how a meaningful evaluation of the criteria that determine whether the policy may be utilized (e.g., the alien's "national security risk" and "public safety threat") could possibly occur in light of the the evidence in *Florida*, which established that DHS "has no idea whether [the arriving aliens] have criminal histories or not" because it "has no way to determine if an alien has a criminal history in his home country unless that country reports the information to the U.S. government or the alien self-reports." *Id.* at *12; *see also id.* at *31 (rejecting DHS's argument that the Parole+ATD policy conforms to the parole regulation, 8 C.F.R. §212.5, because "the supplemental administrative record does not explain how it CBP officers can make a meaningful determination as to whether the alien is a security risk (as contemplated by the regulation) if the alien's home country does not share its criminal history databases with the United States"). Moreover, whenever the policy discusses individual, case-

---

[6] That said, given that the stated purpose of the policy is to move aliens out of border patrol facilities and into the country more quickly, it seems unlikely that the "case-by-case" assessment will be meaningful. *See Florida*, 2023 WL 2399883, at *30 (finding that it was "implausible" that the border patrol could meaningfully assess an alien's individual circumstances in 15 to 30 minutes); *Biden v. Texas*, 142 S. Ct. 2528, 2254-55 (2022) (Alito, J., dissenting) (noting that "simply ... going through a brief checklist for each alien" is "inconsistent with the ordinary meaning of 'case-by-case' review" and that the sheer number of aliens paroled each month "gives rise to a strong inference that the [g]overnment is not really making these decisions on a case-by-case basis").

by-case consideration of each alien, it does so with reference to overcrowding and the CBP's resource constraints, not with regard to any characteristics of that specific alien that might constitute a legally sufficient reason for parole, which strongly suggests that the repeated "case-by-case," "individualized" language is (as it was in the Parole+ATD policy) pretextual.

Additionally, the memo adopting the challenged policy does not reflect any consideration of the additional backlog that will likely be created by releasing aliens into the country without initiating immigration proceedings and then having to track them down to do so if they do not report to ICE—as DHS had to do in the "Operation Horizon" program discussed in the *Florida* decision. *Id.* at *11, *32.

The Court did not overlook Defendants' arguments as to why Florida is unlikely to succeed on the merits and why the new policy is different from the vacated Parole+ATD policy. *See* Doc. 9 at 20-36. However, the Court simply does not find those arguments persuasive. That said, the Court agrees with Defendants that the *Florida* decision "did not preclude DHS from using its parole authority in other ways," *id.* at 22, but what DHS cannot do is adopt a functionally identical policy as the one the Court vacated in the *Florida* decision and then expect a different outcome when that policy is challenged.

With respect to the second factor, the evidence presented in *Florida* established that Florida suffers substantial harm—both to its sovereignty[7] and its public fisc—when the federal government releases aliens into the country on "parole" (or otherwise) rather than detaining them as required by the INA. *See Florida*, 2023 WL 2399883, at *17-18. That same harm will flow from the new policy because, as was the case with the Parole+ATD policy vacated in *Florida*, the new policy is intended to "shift the processing of arriving aliens to ICE facilities around the country that are closer to the aliens' final destinations." *Id.* at *14. The harm to Florida is irreparable because it "cannot be undone through monetary remedies," *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990), because the United States has sovereign immunity from damages claims, *see Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013); *see also State of Florida v. Becerra*, 544 F. Supp. 3d 1241, 1300 (M.D. Fla. 2021) (observing that in an APA action, sovereign immunity bars the recovery of monetary damages from the federal government, thereby making the state's financial injury irreparable), and there is no

---

[7] The Eleventh Circuit has recognized that even though injuries to state sovereignty are "intangible," they are real and concrete. *See W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023). And, as Justice Scalia explained in *Arizona v. United States*, controlling immigration "is an inherent attribute of sovereignty" and it is questionable whether the States would have ratified the Constitution if it had provided that limits on immigration "will be enforced only to the extent the President deems appropriate" because the States "jealously guarded" their sovereignty during the Constitutional Convention. 567 U.S. 387, 422, 436 (2012) (Scalia, J., concurring in part and dissenting in part).

way to remedy the impact on state sovereignty that flows from the Florida's inability to exclude aliens who were improperly "paroled" into the country from its territory.

The third and fourth factors "merge when the Government is the opposing party." *Niken*, 556 U.S. at 435. "The public interest in enforcement of the immigration laws is significant," *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981), and it is even more significant here because DHS's decision to "parole" aliens into the country without first initiating immigration proceedings is precisely what the Court told DHS it could not lawfully do in *Florida*. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."); *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("[F]rustration of federal statutes and prerogatives are not in the public interest…."); *see also Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021) ("[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends."); *Becerra*, 544 F. Supp. 3d at 1304 (concluding that the state's high likelihood of success on the merits showed that injunctive relief preventing the likely unlawful agency action was in the public interest).

The Court did not overlook Defendants' argument that the new policy "comes in response to a moment of crisis at the border," Doc. 9 at 13, and that "[a]n order restricting DHS's parole authority on the eve of the crisis has the serious potential

to cause chaos and undermine the security of the border and the safety of border officials," *id.* at 5.  Putting aside the fact that even President Biden recently acknowledged that the border has been in chaos for "a number of years," Defendants' doomsday rhetoric rings hollow because, as explained in detail in *Florida*, this problem is largely one of Defendants' own making through the adoption an implementation of policies that have encouraged the so-called "irregular migration" that has become fairly regular over the past 2 years.

Nor did the Court overlook the assertion in the affidavit submitted by Defendants with their response in opposition to the motion for a TRO that "[t]he public safety and national security impacts of [enjoining the Parole with Conditions memorandum] would be extraordinary" because it would force USBP to "violate court orders" and possibly leave USBP with "only untenable options such as declining to fully process individuals at all and potentially not even apprehend them to start."  Doc. 9-2 at 9-10.  However, USBP has been in essentially that same position since March when the Court vacated the substantially identical Parole+ATD policy.  Moreover, the Court fails to see a material difference between what CBP will be doing under the challenged policy and what it claims that it would have to do if the policy was enjoined, because in both instances, aliens are being released into the country on an expedited basis without being placed in removal proceedings and with little to no vetting and no monitoring.

14

Finally, although the Government did not make the argument, the Court did not overlook that 8 U.S.C. §1252(f)(1) prohibits any court other than the Supreme Court from "enjoin[ing] or restrain[ing] the operation" of certain aspects of the INA. However, §1252(f)(1) specifically refers to Part IV of the INA, and the parole statute that Defendants purport to implement through the challenged policy is in Part II of the INA. Thus, as explained in *Florida*, §1252(f)(1) does not preclude the Court from enjoining DHS's misuse of its parole authority. 2023 WL 2399883, at *35 (rejecting DHS's argument that §1252(f)(1) precludes the Court from enjoining the Parole+ATD policy and noting that "any indirect impact that vacatur of that policy might have on how DHS exercises its authority under part IV of the INA does not equate to the Court having 'enjoined or restrained' the operation of that part") (alterations adopted).

## Conclusion

In sum, for the reasons stated above, the Court finds that Florida is entitled to a TRO enjoining the implementation and enforcement of DHS's newly adopted parole policy. No bond is required.[8] Accordingly, it is

---

[8] Rule 65(c) states that the court may issue a TRO "only if the movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained," but it is well established in this Circuit that "the amount of security required by the rule is a matter within the discretion of the trial court" and "the court 'may elect to require no security at all.'" *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) (quoting *Corrigan Dispatch Co. v. Casaguzman, F.A.*, 569 F.2d 300, 303 (5th Cir. 1978)). Here, Defendants do not identify any monetary costs or damages they might suffer if the new parole policy is temporarily enjoined, so the Court sees no

**ORDERED** that:

1. DHS is enjoined from implementing or enforcing the parole policy contained in the May 10, 2023, Memorandum from U.S. Border Patrol Chief Raul Ortiz, titled "Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document (Parole with Conditions)."

2. This TRO will take effect at 11:59 p.m. eastern time to correspond with the expiration of the Title 42 Order and to give Defendants an opportunity to seek an emergency stay from a higher court.

3. This TRO will expire 14 days from the date of this Order. *See* Fed. R. Civ. P. 65(b)(2).

4. A preliminary injunction hearing is scheduled for May 19, 2023,[9] at 9:00 a.m. in the United States Courthouse, 1 North Palafox Street, Courtroom 4 North, Pensacola, Florida.

---

reason to impose a bond as a condition of the TRO. *Accord Texas v. United States*, 524 F. Supp. 3d 598, 668 (S.D. Tex. 2021) (requiring no security bond for preliminary injunction barring DHS from pausing removals).

[9] The hearing was scheduled for this date because the Court has two long-overdue criminal trials scheduled for the following week. The Court understands that Fed. R. Civ. P. 65(b)(3) states that the preliminary injunction hearing is to "tak[e] precedence over all other matters except other matters of the same character," but the Court is not inclined to reschedule those trials when it has an earlier date available for the preliminary injunction hearing. And, if the May 19 date is not convenient to the parties, they can agree to a brief extension of the TRO under Rule 65(b)(2) to allow the preliminary injunction hearing to occur the following week—perhaps on May 30. Or, if the parties have no other evidence or argument that they think might change the Court's mind on application of the preliminary injunction factors, they can agree to convert this TRO into a preliminary injunction so they can seek appellate review sooner rather than later.

**DONE and ORDERED** this 11th day of May, 2023.

_____
**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**