UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

STATE OF FLORIDA,

   *Plaintiff*,

   v.                             Case No. 3:23-cv-9962-TKW-ZCB

ALEJANDRO MAYORKAS, et al.,

   *Defendants*.
_____/

**FLORIDA'S RESPONSE TO
DEFENDANTS' EMERGENCY STAY MOTION**

DHS, on an "emergency" basis, seeks a stay pending appeal of this Court's order granting Florida preliminary relief. *See* Doc. 13.[1]

The Court has already rejected DHS's arguments on the merits, and the equities likewise do not favor the extraordinary relief of a stay pending appeal. DHS claims that this relief is necessary "to address the skyrocketing number of encounters

---

[1] Given the parties have agreed for this Court to rule on preliminary relief, Doc. 16, Florida assumes DHS does not plan to appeal the temporary restraining order. Florida therefore frames its response as opposing a stay pending appeal of any preliminary relief this Court might enter, including a preliminary injunction under Rule 65(a) or a stay under 5 U.S.C. § 705. Having said that, there is an additional reason to deny a stay pending appeal of a temporary restraining order. The stay question is whether DHS can "establish a substantial likelihood of success on the merits *of [its] appeal*." *Bowles v. DeSantis*, 934 F.3d 1230, 1238 (11th Cir. 2019) (emphasis added). DHS cannot show that because TROs are not appealable. *See McDougald v. Jenson*, 786 F.2d 1465, 1472 (11th Cir. 1986) (noting that appellate courts typically do not have jurisdiction to review TROs); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225 (11th Cir. 2005) (explaining the narrow exception to this rule, which applies when denial of a TRO would have allowed a patient to be taken off life support and thus mooted the case).

at the southwest border." Doc. 13 at 8. Yet Secretary Mayorkas told ABC News[2] yesterday that, "over the past two days, the United States border patrol has seen an approximately 50 percent drop in the number of people encountered at our southern border."[3] Secretary Mayorkas further stated, specifically in response to a question about this Court's ruling, that "[n]ow with the 50 percent drop in the number of encounters at our southern border, we are executing our consequence regime exactly as planned."[4]

Florida does not know whether this is doublespeak or stale information, but doublespeak by DHS would not be surprising. At the *Florida v. United States* trial, DHS claimed that "disastrous consequences" would come "the day after [Parole + ATD] was ended." *See* Doc. 156 at 184, *Florida v. United States*, No. 3:21-cv-1066 (N.D. Fla. Feb. 17, 2023) (citing the trial transcript). But a declaration by a DHS employee filed here reveals that DHS had already ended Parole + ATD before the trial began. Doc. 13-1 at 2. It is thus difficult to take DHS's parade of horribles at face value here.

Moreover, "a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted." 11A Charles Alan Wright & Arthur R. Miller,

---

[2] Florida has no objection to the Court taking judicial notice of Secretary Mayorkas's statements, especially given he is a named defendant.

[3] https://abcnews.go.com/Politics/week-transcript-5-14-23-sec-alejandro-mayorkas/story?id=99308498.

[4] *Id.*

Federal Practice and Procedure § 2948.1 (3d ed. 2023). It is hard to imagine harms that are more self-inflicted than those DHS claims here.

For these reasons, and those that follow, none of the relevant factors favor the extraordinary remedy of a stay pending appeal, and the Court should deny DHS's request.

## ARGUMENT

### I. THE COURT SHOULD DENY DHS'S MOTION FOR A STAY.

In considering a stay pending appeal, the Court must consider: "(1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits, (2) whether the applicant will be irreparably injured absent a stay, (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding, and (4) where the public interest lies." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019). DHS fails to make a substantial showing on any of these factors.

### a. DHS is not likely to succeed on the merits of its appeal.

#### i. DHS is collaterally estopped from asserting most of its arguments.

DHS is unlikely to succeed on appeal due to the application of collateral estoppel. "Under collateral estoppel, once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue on a different cause of action between the same parties." *Kremer v. Chem. Const. Corp.*,

3

456 U.S. 461, 466 n.6 (1982); *accord CSX Transp., Inc. v. Bhd. of Maitn. of Way Emps.*, 327 F.3d 1309, 1317 (11th Cir. 2003). Mutual collateral estoppel applies against the federal government, *see United States v. Stauffer Chem. Co.*, 464 U.S. 165, 169 (1984), and takes effect even when the decision is pending appeal, *see Jaffree v. Wallace*, 837 F.2d 1461, 1467 (11th Cir. 1988); *Nixon v. Richey*, 513 F.2d 430, 438 n.75 (D.C. Cir. 1975).

As the Court already concluded in the order granting a temporary restraining order, the Court in the Parole + ATD case concluded that the Parole + ATD policy "was final agency action under the APA, that Florida had standing to challenge the policy, and that the policy violated the APA because it was contrary to law, arbitrary and capricious, and adopted without notice and comment." Doc. 10 at 8. And there is "nothing materially different about the new policy . . . that would compel a different result" here. *Id.* at 8–9. Both policies, for instance, involve DHS's use of the parole authority to release aliens at the border without initiating removal proceedings based on DHS's operational circumstances, as opposed to the individual situation of an alien as the statute requires. *See Florida v. United States*, No. 3:21-cv-1066, 2023 WL 2399883, at *30 (N.D. Fla. Mar. 8, 2023).

> **ii. DHS is not likely to succeed on arguments this Court already rejected in *Florida v. United States*.**

Collateral estoppel aside, DHS is unlikely to succeed on arguments this Court rejected in *Florida v. United States* for the reasons the Court articulated in its final

4

order. Florida is likely to show it has standing to challenge an unlawful *en masse* parole policy. *See id.* at *15–20. Such a programmatic parole policy is likely subject to judicial review. *See id.* at *20–23. Florida is likely to show that a parole policy that authorizes the *en masse* release of aliens at the border without initiating removal proceedings is contrary to law, arbitrary and capricious, and subject to notice and comment. *See id.* at *29–33. And Florida is likely to show that vacatur is the appropriate remedy for an unlawful parole policy. *See id.* at *34–35.

For all those reasons, and the reasons stated in this Court's order granting a temporary restraining order, Doc. 10, DHS is not likely to succeed on the merits of its appeal.

### iii. DHS is not likely to succeed in any new arguments raised in this action.

To the extent there are material differences between the Parole + ATD Policy and the Parole + Conditions Policy, those differences highlight further why DHS will not be able to succeed on the merits of its appeal.

*First*, the Parole + Conditions Policy fails to account for § 1182(d)(5)'s requirement that an alien be returned to custody once the purposes of parole have been served. *See* 8 U.S.C. § 1182(d)(5). Specifically, the memo allows a released alien "to request service of an NTA *by mail*." Doc. 9-1 at 5 (emphasis added). If DHS is serving aliens by mail, it is not even considering taking them back into custody.

5

*Second*, although the policy pays lip service to the statute's requirement that parole determinations should be "assessed on a case-by-case, individualized basis," Doc. 9-1 at 5, in reality it is, as the policy states, an "additional mechanism[] to ensure that individual noncitizens are processed expeditiously and released from or transferred out of USBP custody in a safe, swift, humane, and orderly fashion," Doc. 9-1 at 3. It is therefore "largely focused on DHS's operational circumstances rather than an individual alien's circumstances," contrary to the parole statute's requirements. *Florida v. United States*, 2023 WL 2399883, at *30. That description has all the features of a mass release policy for operational convenience and none of the features of a policy that complies with the parole statute as interpreted by this Court. *See id.* at *31 ("[C]reating an entirely new 'processing pathway' to avoid the process mandated by § 1225 is inconsistent with the narrow language in § 1182(d)(5).").

*Third*, based on the anticipated number of border crossers in DHS's declaration, Doc. 13-1 at 6, and the representations from DHS's counsel about the alleged dire need for this policy, it is obvious that DHS plans to use this policy for *en masse* release—just as it did under the three prior iterations of the policy, *Florida v. United States*, 2023 WL 2399883, at *8–12 (describing the past iterations). In fact, the last iteration of this policy purported to modify its predecessor policy so that parole would be "used sparingly." *Id.* at *32. But DHS granted more paroles under

6

that policy than any before it, including over 90,000 in the month of November 2022.[5] *Id.* Lest there be any doubt, DHS reportedly paroled 6,000 aliens under the policy on the only full day it was in effect.[6]

*Fourth*, Parole + Conditions was subject to notice and comment, and DHS's invocation of the "good cause," "general statement of policy," "interpretative rule," and "procedural rule" exceptions are all meritless. *See* Doc. 9-1 at 6–7; Doc. 9 at 28–36; *Florida v. United States*, 2023 WL 2399883, at *32–33 (concluding that the Parole + ATD policy was subject to notice and comment).

DHS cannot avoid the notice and comment requirements of 5 U.S.C. § 553 by invoking the "good cause" exception. *See Florida v. Becerra*, 544 F. Supp. 3d 1241, 1295–99 (M.D. Fla. 2021) (discussing the high bar necessary to invoke "good cause" and collecting authorities). This Court vacated the Parole + ATD policy on March 8, 2023. DHS—knowing it had limited release mechanisms and expecting a surge of traffic at the border—apparently made no attempt to establish a successor parole policy until the day before the Title 42 order was set to expire. "Good cause cannot arise as a result of the agency's own delay," *Nat. Res. Def. Council v. Nat'l Highway*

---

[5] https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics, U.S. Border Patrol - Dispositions and Transfers tab.

[6] Stephen Dinan, *Border Patrol paroled 2,500 migrants after judge's ruling halting program*, Wash. Times (May 14, 2023), https://www.washingtontimes.com/news/2023/may/14/border-patrol-paroled-2500-migrants-after-judges-r/.

*Traffic Safety Admin.*, 894 F.3d 95, 114 (2d Cir. 2018), and DHS's delay cannot excuse its failure to conduct notice and comment here.

Similarly, DHS cannot claim that Parole + Conditions is an interpretive rule or statement of general policy. *See* Doc. 9 at 28–30. An interpretive rule is a "statement[] as to what the administrative officer thinks the statute or regulation means." *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979) (quoting *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C. Cir. 1952)).[7] The memo does not "purport to interpret a statute or regulation," *id.*, or try to explain the meaning of § 1182(d)(5), so it cannot be an interpretive rule. Likewise, "[a] general statement of policy . . . is merely an announcement to the public of the policy which the agency hopes to implement" and "presages an upcoming rulemaking." *Id.* at 701 (quotations omitted). The Parole + Conditions memo establishes a substantive change in policy effective immediately and cannot be a general statement of policy.

Finally, Parole + Conditions is not a rule of "agency organization, procedure, or practice," 5 U.S.C. § 553(b)(A); *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) (describing these rules as "primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties" (quotations omitted)). Here, the memo

---

[7] Fifth Circuit decisions issued before close of business on September 30, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209–10 (11th Cir. 1981) (en banc).

"alter[s] the standards imposed" on aliens and is therefore a substantive rule. *Mendoza*, 754 F.3d at 1024 (emphasis omitted).

*Fifth*, the Parole + Conditions memo is arbitrary and capricious because it is a pretextual attempt to circumvent this Court's prior ruling. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019) ("The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions . . . ."). Instead of approaching the problem in good faith, such as by seeking a stay of this Court's ruling, DHS slapped a new label on the same Parole + ATD Policy that this Court vacated and went about its business. *See Franklin Sav. Ass'n v. Off. of Thrift Supervision*, 35 F.3d 1466, 1472 (10th Cir. 1994) ("The [APA] protects from agency action that is arbitrary and capricious *or in bad faith*." (emphasis added)).

*Finally*, to the extent DHS raises new arguments about the applicability of 8 U.S.C. § 1252, those also fail.

DHS claims that § 1252(f)(1)—despite specifically excluding the subchapter containing § 1182(d)(5)—extends to cover § 1182(d)(5) because that provision "implements" § 1225. Doc. 13 at 12–13. But the Supreme Court has emphasized "the narrowness of [§ 1252(f)(1)'s] scope." *Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022). Surely a narrow interpretation of § 1252(f)(1) would not permit its application to a statute that it explicitly does not apply to.

9

Likewise, § 1252(a)(2)(B)(ii) does not bar relief. That section applies to "[d]enials of discretionary relief," and Florida does not challenge a denial of discretionary relief. Rather, Florida challenges DHS's broad scale implementation of § 1182(d)(5). *Cf. Biden v. Texas*, 142 S. Ct. at 2543 ("DHS's exercise of discretion within [§ 1182(d)(5)] must be reasonable and reasonably explained.").

### iv. Florida plainly has standing.

In *Florida v. United States*, the Court heard evidence regarding Florida's standing to challenge the Parole + ATD Policy. In finding that Florida had standing, the Court concluded that Florida was entitled to special solicitude in the standing analysis. *Florida v. United States*, 2023 WL 2399883, at *17–20. And the evidence before the Court demonstrated that released aliens frequently travel to Florida, *id.* at *14–16, consume public services after they arrive in Florida,[8] and have increased the number of students for whom the State must provide free public education, *id.* at *15–16.

The same evidence is now before the Court, *see* Doc. 16, and the Court should reach the same conclusion. It is of no moment that Florida has not presented specific evidence regarding harm from *this* policy. This policy barely went into effect, and it is reasonable for the Court to infer that a substantially similar policy regarding the

---

[8] Those public services include public education, incarceration costs for aliens who commit crimes, unemployment benefits, and emergency Medicaid. *Id.* at *15.

10

application of the very same statute will affect the State in the same ways. *See Dep't of Com.*, 139 S. Ct. at 2566 (courts may consider "the predictable effect of Government action" for standing purposes in APA cases).

### b. DHS's claims of irreparable harm are unpersuasive.

DHS presents a parade of horribles that supposedly will occur should DHS be unable to use Parole + Conditions. The Court should not credit DHS's claims of dire emergencies.

*First*, DHS's claims are not credible in light of its misrepresentations to this Court on the very same issue. During closing argument in *Florida v. United States*, DHS's attorneys represented that vacatur of Parole + ATD would have "disastrous consequences" that would begin "the day after [Parole + ATD] was ended" and doubled down on that representation in their proposed order filed a few weeks later. Doc. 156 at 184, *Florida v. United States*, No. 3:21-cv-1066 (N.D. Fla. Feb. 17, 2023). DHS's claims that the sky would fall if this Court ended Parole + ATD were apparently not true. A declaration by a DHS employee filed in this case reveals that "CBP has not utilized Parole + [ATD] since January 2, 2023," Doc. 13-1 at 2—seven days before trial began and 45 days before DHS filed its proposed order. DHS's unwillingness or inability to be candid and to correct misrepresentations to this Court counsels against giving weight to its claims now. *See also supra* at 1–2 (discussing recent comments by Secretary Mayorkas that arguably contradict representations

11

made in this case). The Court therefore should find that DHS's latest forecast of doom is not credible.

Even if its claims were given weight, DHS's decision to slow walk its appeal of the Court's order vacating Parole + ATD negates any claim of impending harm. If DHS truly needed an *en masse* parole policy to police the Southwest Border, it should have availed itself of the seven-day stay this Court allowed so that it could seek emergency appellate relief. At a minimum, it should not have waited 58 days to file its notice of appeal. "[A] party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted." 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2023); *accord Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021), *stay denied*, *Biden v. Texas*, 142 S. Ct. 926 (2021).

And speaking of self-inflicted harm, the crisis at the border was entirely predictable and was created by Defendants' own actions. As this Court recognized in *Florida v. United States*, "[DHS] effectively incentivized what they call 'irregular migration' that has been ongoing since early 2021 by establishing policies and practices that all-but-guaranteed that the vast majority of aliens arriving at the Southwest Border who were not excluded under the Title 42 Order would not be detained and would instead be quickly released into the country where they would

12

be allowed to stay (often for five years or more) while their asylum claims were processed or their removal proceedings ran their course." 2023 WL 2399883, at *7.

### c. Florida would be irreparably harmed by a stay.

Florida's financial injuries "cannot be undone through monetary remedies," *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991), because the United States has sovereign immunity, *Odebrecht Cons., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013).

Moreover, the Eleventh Circuit has recognized that even though injuries to state sovereignty are "intangible," they are real and concrete. *See W. Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023); *Florida v. Nelson*, 576 F. Supp. 3d 1017, 1039–40 (M.D. Fla. 2021) (explaining that sovereign injury is irreparable). As Justice Scalia explained in *Arizona v. United States*, controlling immigration "is an inherent attribute of sovereignty" and it is questionable whether the States would have ratified the Constitution if it had provided that limits on immigration "will be enforced only to the extent the President deems appropriate" because the States "jealously guarded" their sovereignty during the Constitutional Convention. 567 U.S. 387, 422, 436 (2012) (Scalia, J., concurring in part and dissenting in part).

### d. *The public interest weighs against a stay.*

DHS's request for a stay is not in the public interest. To start, "the public interest in enforcement of the immigration laws is significant." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d. 1211, 1221 (D.C. Cir. 1981); *accord Nken*, 556 U.S. at 436 (finding public interest in "prompt execution of removal orders"). And "[f]orcing federal agencies to comply with the law is undoubtedly in the public interest." *Cent. United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015).

DHS accuses this Court of "undermining the Executive Branch's constitutional and statutory authority." Doc. 13 at 6. That argument is remarkable. The Court is not invading the Executive Branch's prerogatives by "say[ing] what the law is." *Florida v. United States*, 2023 WL 2399883, at *21. Rather, DHS is invading the Judicial Branch's prerogatives by flagrantly ignoring this Court's orders.[9]

Finally, for the reasons explained above—and throughout this action—DHS's behavior demonstrates bad faith in seeking to circumvent this Court's prior order. It is not in the public interest to permit DHS to do so.

---

[9] DHS's suggestion that it is entitled to a stay merely because this case is about immigration is meritless. *See* Doc. 13 at 5. The Supreme Court declined to grant a stay in the last two major immigration cases to come before it. *Biden v. Texas*, 142 S. Ct. 926 (2021); *United States v. Texas*, 143 S. Ct. 51 (2022). And in one of those cases, the Supreme Court ultimately ruled for DHS, *Biden v. Texas*, 142 S. Ct. at 2539, suggesting the Court gave that case no special treatment at the stay stage merely because it concerned immigration.

## CONCLUSION

For the foregoing reasons, the Court should deny DHS's request for a stay pending appeal.

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival (FBN 1016188)
CHIEF OF STAFF

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Natalie P. Christmas (FBN 1019180)
COUNSELOR TO THE ATTORNEY GENERAL

Joseph E. Hart (FBN 124720)
COUNSELOR TO THE ATTORNEY GENERAL

Anita Patel (FBN 70214)
ASSISTANT BUREAU CHIEF

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

## CERTIFICATE OF COMPLIANCE

This response complies with the requirements of Local Rule 7.1(F) because it contains 3,489 words.

                                                      */s/ James H. Percival*
                                                      Chief of Staff

## CERTIFICATE OF SERVICE

I certify that on May 15, 2023, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which provides service to all parties.

*/s/ James H. Percival*
Chief of Staff
