## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

STATE OF FLORIDA,

    *Plaintiff*,

    v.                              Case No. 3:23-cv-9962-TKW-ZCB

ALEJANDRO MAYORKAS, et al.,

    *Defendants*.

_____/

## FLORIDA'S PROPOSED ORDER

Before this Court is Florida's motion for a preliminary injunction and to postpone the effective date of DHS's Parole + Conditions Policy. *See* Fed. R. Civ. P. 65(a); 5 U.S.C. § 705. The Court already entered a temporary restraining order against the Parole + Conditions Policy, and the Court now dissolves that order and grants Florida's motion.[1]

---

[1] Ordinarily, the Court would *either* postpone the effective date of the Parole + Conditions Policy under 5 U.S.C. § 705 *or* grant a preliminary injunction. But DHS has raised certain arguments regarding the categorical unavailability of injunctive relief and other arguments regarding the categorical unavailability of a stay. As explained below, the Court rejects DHS's arguments. To aid appellate review, however, the Court clarifies that Florida has met the requirements for both forms of relief and this order should be understood to grant both. Moreover, DHS's misconduct in this case rebuts the usual presumption that an APA remedy is alone sufficient to redress Florida's harm, necessitating injunctive relief.

## BACKGROUND

To put the Parole + Conditions Policy in its proper context, it is necessary to briefly review DHS's actions over the last two years. It is quite clear to this Court that DHS desires to have a mechanism—known as a "processing pathway"—for Border Patrol to quickly release aliens from its custody without initiating removal proceedings or conducting an asylum screening. This desire arose shortly after President Biden took office.[2] It is also clear to this Court that DHS strongly desires to delay or avoid judicial review of such a policy, and it has engaged in a series of bad faith actions against the State of Florida to accomplish that end.[3]

On March 19, 2021, DHS adopted the first iteration of this policy, which was known as the "prosecutorial discretion" or "notice to report" policy. *Florida v. United States*, No. 3:21-cv-1066, 2023 WL 2399883, at *8 (N.D. Fla. Mar. 8, 2023). Under that policy, DHS engaged in the mass release of inadmissible aliens at the border without initiating removal proceedings or conducting an asylum screening. *Id.* Instead, DHS issued each released alien a piece of paper called a "notice to

---

[2] As the Court previously found, DHS adopted a non-detention policy shortly after President Biden took office. *Florida v. United States*, No. 3:21-cv-1066, 2023 WL 2399883, at *12–13 (N.D. Fla. Mar. 8, 2023). Under that policy, DHS eliminated effective enforcement tools, reduced detention capacity, and instructed officials to release rather than detain aliens at the border absent evidence of a public safety risk, which is rarely present because DHS generally does not have access to criminal history in other countries. *Id.* at *12–14, *16 at n. 23, *31. Thus, whatever the level of traffic at the border now, DHS's *en masse* release practices preceded—and, in large part, caused—the current crisis at the border. *Id.* at *7.

[3] Florida refers to this dynamic as a "game of whack-a-mole." The Court declines to adopt that description, though it does not find it inaccurate.

report" and sent the alien on his way. *Id.* Failure to report, however, carried no consequences because a notice to report does not initiate removal proceedings or have any other legal effect. As this Court recognized, it was essentially "immigration by the honor system." *Id.*

DHS did not make that policy public, but after a news article reported on its existence, Florida sued to invalidate it on September 28, 2021. *See* Doc. 1, *Florida v. United States*, 3:21-cv-1066 (N.D. Fla.). Almost immediately, DHS rescinded the policy. *Florida v. United States*, 2023 WL 2399883, at *8–9.

In place of the prosecutorial discretion policy, DHS then issued the Parole Plus Alternatives to Detention Policy on November 2, 2021 (the November Parole + ATD Policy). *Id.* at *9–10. That policy operated similarly to its predecessor but with a formal grant of parole under 8 U.S.C. § 1182(d)(5). *Id.* The November Parole + ATD Policy supposedly existed solely for COVID-19 mitigation and was available only for family units. *Id.* at *10. But a DHS witness admitted during his deposition that neither of those things were true. Doc. 70 at 2, *Florida v. United States*, 3:21-cv-1066 (N.D. Fla. July 20, 2022) (citing deposition transcripts). Rather, the agency was using the policy for reasons unrelated to COVID and for adult aliens traveling alone. *Id.* Five days after that deposition, DHS rescinded that policy too. *Id.* at 3.

DHS replaced the November Parole + ATD Policy with another Parole + ATD Policy on July 18, 2022 (the July Parole + ATD Policy). *Florida v. United States*,

2023 WL 2399883, at *10. The new iteration was substantially similar to the former except that it abandoned the COVID rationale and covered single adults traveling alone. *Id.*

A four-day bench trial began on January 9, 2023. *Florida v. United States*, 2023 WL 2399883, at *1. Although the Court reviewed the July Parole + ATD Policy based on the administrative record, the Court held a trial to address other triable issues including Florida's standing and claims not challenging Parole + ATD. *Id.* at *3. During closing arguments, which also served as oral argument on the Parole + ATD administrative record, counsel for DHS represented that vacatur of Parole + ATD would have "disastrous consequences" in "the near term" and that these disastrous consequences would begin "the day after [Parole + ATD] was ended." *See* Doc. 156 at 184, *Florida v. United States*, 3:21-cv-1066 (N.D. Fla. Feb. 16, 2023) (quoting Tr. Day 4, 227:19–25). A few weeks later, DHS doubled down on that position in its proposed order. Doc. 156 at 184, *Florida v. United States*, No. 3:21-cv-1066 (N.D. Fla. Feb. 16, 2023).

In both instances, DHS's representations to the Court were false, and DHS knew they were false. That is now clear for the first time because DHS submitted a declaration in *this* case admitting that it voluntarily ceased using Parole + ATD on January 2, 2023, *seven days before* the trial in *Florida v. United States* began and 45 days before DHS filed its proposed order. Doc. 13-1 at 2. In other words, in *that*

case, DHS twice represented to the Court that vacating the policy at issue would cause disaster, all the while knowing the policy in fact was on hold at the government's behest regardless of any relief ordered by the Court.

The Court entered its final judgment and order on March 8, 2023. *Florida v. United States*, 2023 WL 2399883, at *35. The Court found that the July Parole + ATD Policy was contrary to law, arbitrary and capricious, and subject to notice and comment. *Id.* at *29–33. Unaware that DHS had already voluntarily ceased using the policy, the Court stayed its order for seven days to allow DHS to seek emergency appellate relief. *Id.* at *35.

But DHS did not seek emergency appellate relief. It did the opposite, waiting 58 days just to file its notice of appeal. Doc. 159, *Florida v. United States*, No. 3:21-cv-1066 (N.D. Fla. May 5, 2023). And four days after this Court's order, DHS submitted a budget request asking Congress to reduce its detention capacity,[4] which was already down substantially since President Biden took office, *Florida v. United States*, 2023 WL 2399883, at *13–14. All told, it appears that DHS got by just fine without Parole + ATD for several months.

According to DHS, that changed with the anticipated end of Title 42. But DHS has known about the end of Title 42 since *before* this Court vacated Parole + ATD.

---

[4]      https://www.dhs.gov/sites/default/files/2023-03/U.S%20IMMIGRATION%20AND%20CUSTOMS%20ENFORCEMENT_Remediated.pdf (pdf page 50).

And DHS has known for more than a year that, whenever Title 42 ended, border traffic would increase significantly. *See Florida v. United States*, 2023 WL 2399883, at *3 (finding that border traffic numbers were expected to increase when Title 42 expired).

For reasons the Court still does not understand, however, DHS did nothing to prepare for that increase in border traffic. It did not seek a stay of this Court's order, and it did not seek to complete notice and comment on a new policy, although it had time to do so. Instead, on May 10, 2023, one day before the Title 42 order was set to expire, a "DHS Spokesperson" gave a statement to NBC News explaining how the agency planned to manage the end of Title 42.[5]

Because DHS's plans sounded materially identical to the Parole + ATD Policy vacated by this Court, Florida filed this lawsuit the same day DHS made its latest scheme public. Florida sought a temporary restraining order the next day, May 11. Docs. 1 & 2. After Florida filed that motion, counsel for DHS sent a copy of the new policy—the Parole + Conditions Policy— to Florida, which the State filed with this Court. The agency filed a response to Florida's motion several hours later. Docs. 5 & 9. After reviewing the policy and DHS's brief, the Court found the policy itself and DHS's arguments defending it to be materially the same as the Parole + ATD

---

[5] Julia Ainsley, *Biden admin to allow for the release of some migrants into the U.S. with no way to track them*, NBC News (May 10, 2023), https://www.nbcnews.com/politics/biden-admin-plans-order-release-migrants-us-no-way-to-track-rcna83704.

policy the Court had already vacated.[6] Doc. 10. The Court granted the motion that evening and made it effective at 11:59 p.m. Eastern, just before the expiration of Title 42. Doc. 10.

The Court now must decide whether to grant Florida a preliminary injunction and an order postponing the effective date of DHS's Parole + Conditions Policy. *See* Fed. R. Civ. P. 65(a); 5 U.S.C. § 705.

## ANALYSIS

Both a preliminary injunction under Rule 65(a) and an APA stay under 5 U.S.C. § 705 require a movant to show (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of [that] relief," (3) "that the balance of equities tips in his favor," and (4) "that [the relief] is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Texas v. EPA*, 829 F.3d 405, 424, 435 (5th Cir. 2016) (explaining that the preliminary injunction standard applies to requests for a stay under the APA).

### I.   LIKELIHOOD OF SUCCESS ON THE MERITS.

#### a. Collateral estoppel.

DHS is unlikely to succeed because of the application of collateral estoppel. "Under collateral estoppel, once a court decides an issue of fact or law necessary to

---

[6] The Court provided a more detailed description of the Parole + Conditions Policy in its order granting a temporary restraining order. *See* Doc. 10 at 4–7.

its judgment, that decision precludes relitigation of the same issue on a different cause of action between the same parties." *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 466 n.6 (1982); *accord CSX Transp., Inc. v. Bhd. of Maint. of Way Emps*, 327 F.3d 1309, 1317 (11th Cir. 2003) (describing the four-part test for collateral estoppel). Mutual collateral estoppel applies against the federal government, *see United States v. Stauffer Chem. Co.*, 464 U.S. 165 (1984), and takes effect even when the decision is pending appeal, *see Jaffree v. Wallace*, 837 F.2d 1461, 1467 (11th Cir. 1988); *Nixon v. Richey*, 513 F.2d 430, 438 n.75 (D.C. Cir. 1975).

As the Court already concluded in the order granting a temporary restraining order, the Court in the Parole + ATD case concluded that the Parole + ATD policy "was final agency action under the APA, that Florida had standing to challenge the policy, and that the policy violated the APA because it was contrary to law, arbitrary and capricious, and adopted without notice and comment." Doc. 10 at 8. And there is "nothing materially different about the new policy . . . that would compel a different result" here. *Id.* at 8–9. Both policies, for instance, involve DHS's use of the parole authority to release aliens at the border without initiating removal proceedings based on DHS's operational circumstances, as opposed to the individual situation of an alien as the statute requires. *See Florida v. United States*, 2023 WL 2399883, at *30; Doc. 10 at 10–11.

It is thus likely that Florida will be able to show that DHS is collaterally estopped from applying the new Parole + Conditions Policy.

### b. Standing.

DHS has not contested Florida's standing, but the Court has an independent duty to address its jurisdiction. In *Florida v. United States*, the Court heard evidence regarding Florida's standing to challenge the Parole + ATD Policy. In finding that Florida had standing, the Court concluded that the State was entitled to special solicitude. *Florida v. United States*, 2023 WL 2399883, at *17–18. Moreover, the evidence demonstrated that released aliens frequently travel to Florida and consume public services after they arrive,[7] increasing, for example, the number of students for whom the State must provide free public education. *Id.* at *14, *16, *18.

The same evidence is before the Court here. Although the challenged policy was issued just days ago, it is in substance the same policy this Court vacated in *Florida v. United States*. Florida of course does not yet have evidence regarding specific, known harms caused by the new policy, as the policy had only just taken effect when this Court entered a temporary restraining order. That is no obstacle to the relief Florida seeks, in any event, because there is every reason to believe that

---

[7] Those public services include public education, incarceration costs for aliens who commit crimes, unemployment benefits, and emergency Medicaid. *Florida v. United States*, 2023 WL 2399883, at *15–16.

materially identical policies will cause materially identical injuries to the State. DHS has offered no persuasive argument to the contrary.

### c. *The availability of remedies.*

DHS argues that 8 U.S.C. § 1252(f) bars injunctive relief in this case. But, as this Court has already explained, § 1252(f) applies to part IV of the relevant subchapter, while § 1182(d)(5) is in part II. *Florida v. United States*, 2023 WL 2399883, at *35. DHS responds by suggesting that § 1182(d)(5) "implements" § 1225, which is in part IV. Doc. 13 at 13. But that argument makes little sense, especially given the Supreme Court's holding regarding the "the narrowness of [§ 1252(f)(1)'s] scope." *Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022).

Moreover, even if § 1252(f) applied, it would not bar a stay under 5 U.S.C. § 705. As this Court has explained, § 1252(f) does not affect the availability of vacatur under 5 U.S.C. § 706, *Florida v. United States*, 2023 WL 2399883, at *35, and the same reasoning would apply to 5 U.S.C. § 705, *see Texas v. Biden*, No. 2:21-cv-67, 2022 WL 17718634, at *8–9 (N.D. Tex. Dec. 15, 2022).

DHS also argues that § 1252(a)(2)(B)(ii) bars any relief in this case. But that section applies to "[d]enials of discretionary relief," and Florida does not challenge a denial of discretionary relief. Rather, Florida challenges DHS's broad scale implementation of § 1182(d)(5). *Cf. Biden v. Texas*, 142 S. Ct. at 2543–44 (suggesting the parole authority is subject to judicial review by expressing that

"DHS's exercise of discretion within [§ 1182(d)(5)] must be reasonable and reasonably explained.").

Finally, DHS argues that a stay under 5 U.S.C. § 705 is categorically unavailable once a policy is in effect. But even the cases supporting that position relate to stays issued by *agencies*, which are governed by different language in § 705 than courts, and courts "routinely stay already-effective agency action under Section 705." *Texas v. Biden*, 2022 WL 17718634, at *8 (collecting authorities).

### d. The availability of judicial review under the APA.

The APA permits challenges only to "final agency action." 5 U.S.C. § 704. An agency action is final if it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations omitted).

The Parole + Conditions Policy meets that test because it "instructs agents how to exercise their discretionary authority under the parole statute and sets criteria by which aliens are eligible or ineligible for parole." *Florida v. United States*, 2023 WL 2399883, at *22. Further, it establishes new marching orders for agents and determines Florida's obligations to provide benefits to certain aliens, particularly its obligations to provide public education, Medicaid, and unemployment benefits. *Id.*

The APA also exempts from judicial review actions that are "committed to agency discretion," 5 U.S.C. § 701(a)(2)—in other words, where the statute leaves "no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (quotations omitted). The parole authority in § 1182(d)(5) is not unbounded and has meaningful standards. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2568 (2019); *Florida v. United States*, 2023 WL 2399883, at *23. Further, the Supreme Court has indicated that use of the parole authority is subject to APA review. *See Florida v. United States*, 2023 WL 2399883, at *23 (citing *Biden v. Texas*, 142 S. Ct. at 2543).

### e.  The merits of Florida's APA claims.

#### i.  Contrary to law.

Section 1182(d)(5) permits DHS to parole aliens into the United States "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit" and requires that aliens be returned to custody "when the purposes of such parole . . . have been served." Florida argues that the Parole + Conditions Policy is contrary to law. *See* 5 U.S.C. § 706(2). This Court agrees.

This Court has already explained at length the reasons that *en masse* parole as a means of operational convenience to release aliens without initiating removal proceedings is plainly contrary to § 1182(d)(5). *Florida v. United States*, 2023 WL 2399883, at *30–31. And this Court finds as a factual matter that the Parole +

Conditions Policy is materially similar to the Parole + ATD Policy. Moreover, the Parole + Conditions Policy suffers several additional flaws.

*First*, the Parole + Conditions Policy fails to account for § 1182(d)(5)'s requirement that an alien be returned to custody once the purposes of parole have been served. *See* 8 U.S.C. § 1182(d)(5). Specifically, the memo allows a released alien "to request service of an NTA *by mail*." Doc. 9-1 at 5 (emphasis added). If DHS is serving aliens Notices to Appear by mail, it is not even considering taking them back into custody.

*Second*, although the policy pays lip service to the statute's requirement that parole determinations "must be assessed on a case-by-case, individualized basis," Doc. 9-1 at 5, in reality it is, as the policy states, an "additional mechanism[] to ensure that individual noncitizens are processed expeditiously and released from or transferred out of USBP custody in a safe, swift, humane, and orderly fashion." Doc. 9-1 at 3. It is therefore "largely focused on DHS's *operational circumstances* rather than an individual alien's circumstances," contrary to the parole statute's requirements. *Florida v. United States*, 2023 WL 2399883, at *30. That description has all the features of a mass release policy for operational convenience and none of the features of a policy that complies with the parole statute as interpreted by this Court. *See id.* at *31 ("[C]reating an entirely new 'processing pathway' to avoid the

process mandated by § 1225 is inconsistent with the narrow language in § 1182(d)(5).").

*Third*, based on the anticipated number of border crossers in DHS's declaration, Doc. 13-1 at 6, and the representations from counsel about the allegedly dire need for this policy, DHS obviously plans to use this policy for *en masse* release—just as it did under the three prior iterations of the policy, *Florida v. United States*, 2023 WL 2399883, at *8–12 (describing the past iterations). In fact, the last iteration of this policy purported to modify its predecessor policy so that parole would be "used sparingly." *Florida v. United States*, 2023 WL 2399883, at *32 (quoting the July 2022 Parole + ATD memo). But DHS granted parole more frequently under that policy than any before it, *id.*, including more than 90,000 grants in the month of November 2022.[8] The estimated processing times for Parole + Conditions, Doc. 13-1 at 7 (20 minutes for the head of household and 5 minutes for each additional family member), confirm that minimal individual consideration will be given to aliens. *See Florida v. United States*, 2023 WL 2399883, at *30 ("It is implausible that USBP could meaningfully assess an alien's individual circumstances in 15 to 30 minutes.").

---

[8]  https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics, U.S. Border Patrol - Dispositions and Transfers tab.

For these reasons, Florida is likely to show that the Parole + Conditions Policy is contrary to law.

## ii. Notice and comment.

Florida argues that Parole + Conditions is an agency rule affecting legal rights and obligations and thus subject to notice and comment under the APA. *See* 5 U.S.C. § 553. This Court concluded that Parole + ATD was subject to notice and comment and remanded to DHS "for further proceedings consistent" with the Court's opinion. *Florida v. United States*, 2023 WL 2399883, at *32–33, *35. DHS's attempt to promulgate a materially similar rule in secret without notice and comment not only violates the APA but likely also violates the Court's order.

DHS cannot avoid the notice and comment requirements of 5 U.S.C. § 553 by invoking the "good cause" exception. *See Florida v. Becerra*, 544 F. Supp. 3d 1241, 1295–99 (M.D. Fla. 2021) (discussing the high bar necessary to invoke "good cause" and collecting authorities). This Court vacated the Parole + ATD policy on March 8, 2023. DHS—knowing it had limited release mechanisms and expecting a surge of traffic at the border—did nothing until the day before the Title 42 order was set to expire. "Good cause cannot arise as a result of the agency's own delay," *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 114 (2d Cir. 2018), and DHS's delay cannot excuse its failure to conduct notice and comment here.

DHS's attempts to invoke other notice and comment exceptions similarly fall flat, as none of the invoked exceptions apply here. Parole + Conditions is not an interpretive rule under 5 U.S.C. § 553(b)(A). An interpretive rule is a "statement[] as to what the administrative officer thinks the statute or regulation means." *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979) (quoting *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C. Cir. 1952)).[9] But Parole + Conditions does not "purport to interpret a statute or regulation," *id.*, or try to explain the meaning of § 1182(d)(5), so it cannot be an interpretive rule.

Likewise, Parole + Conditions is not a general statement of policy under 5 U.S.C. § 553(b)(A). "A general statement of policy . . . is merely an announcement to the public of the policy which the agency hopes to implement" and "presages an upcoming rulemaking." *Brown Express, Inc.*, 607 F.2d at 701 (quotations omitted). Because the Parole + Conditions memo establishes a substantive change in policy effective immediately, it cannot be a "general statement of policy."

Finally, Parole + Conditions is not a rule of "agency organization, procedure, or practice" under 5 U.S.C. § 553(b)(A); *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) (describing these rules as "primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the

---

[9] Fifth Circuit decisions issued before close of business on September 30, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

rights [or] interests of affected parties"). Here, the Parole + Conditions Policy "alter[s] the standards imposed" on aliens and is therefore a substantive rule. *Id.* at 1024 (emphasis omitted).

For these reasons, Florida is likely to succeed on the merits of its claim that the Parole + Conditions Policy violates the notice and comment provisions of the APA.

### iii.  Arbitrary and Capricious.

Florida argues that Parole + Conditions is arbitrary and capricious. *See* 5 U.S.C. § 706(2). The Court agrees.

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). The Parole + Conditions Policy is arbitrary and capricious because it is a pretextual attempt to circumvent this Court's prior ruling. Instead of approaching the problem in good faith, such as by seeking a stay of this Court's ruling, DHS slapped a new label on the same Parole + ATD Policy that this Court vacated and went about its business. This is the very definition of "capricious." *See Franklin Sav. Ass'n v. Office of Thrift Supervision*, 35 F.3d 1466, 1472 (10th Cir. 1994) ("The [APA] protects from agency action that is arbitrary and capricious or in bad faith.").

Moreover, this Court vacated the Parole + ATD Policy as arbitrary and capricious, among other reasons, because it failed to consider the backlog created by

17

the policy. *See Florida v. United States*, 2023 WL 2399883, at *11, *32 (explaining that, for every month Parole + ATD continued, the backlog would increase by another year). DHS's decision to create another version of that policy, again without considering the backlog, is both contrary to this Court's previous decision and arbitrary and capricious.

For these reasons, Florida is likely to succeed in showing that the Parole + Conditions Policy is arbitrary and capricious.

## II.   IRREPARABLE HARM.

For much the same reasons Florida has standing, the State will suffer irreparable harm absent preliminary relief. Florida's financial injuries "cannot be undone through monetary remedies," *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991), because the United States has sovereign immunity, *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013).

Moreover, the Eleventh Circuit has recognized that even though injuries to state sovereignty are "intangible," they are real and concrete. *See West Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023); *Florida v. Nelson*, 576 F. Supp. 3d 1017, 1040–41 (M.D. Fla. 2021) (explaining that sovereign injury is irreparable). As Justice Scalia explained in *Arizona v. United States*, controlling immigration "is an inherent attribute of sovereignty." 567 U.S.

387, 422, 436 (2012) (Scalia, J., concurring in part and dissenting in part). And because the States "jealously guarded" their sovereignty during the Constitutional Convention, it is questionable whether the States would have ratified the Constitution if it had provided that limits on immigration "will be enforced only to the extent the President deems appropriate." *Id.*

### III.   BALANCE OF THE EQUITIES AND PUBLIC INTEREST.

The equities and public-interest factors merge for federal government action. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Both favor an injunction here. "[T]he public interest in enforcement of the immigration laws is significant." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d. 1211, 1221 (D.C. Cir. 1981); *accord Nken*, 556 U.S. at 436 (finding public interest in "prompt execution of removal orders"). And "[f]orcing federal agencies to comply with the law is undoubtedly in the public interest." *Cent. United Life., Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015). The public interest favors Florida all the more here because DHS is plainly acting in bad faith and seeking to avoid this Court's previous ruling.

The Court also has reason to be skeptical of DHS's assertions regarding its harms. For example, DHS claims that an injunction will prevent it from "address[ing] the skyrocketing number of encounters at the southwest border." Doc. 13 at 8. Yet Secretary Mayorkas told ABC News yesterday that, "over the past two days, the United States border patrol has seen an approximately 50 percent drop in

the number of people encountered at our southern border."[10] Secretary Mayorkas further stated, specifically in response to a question about this Court's ruling on the temporary restraining order, that "[n]ow with the 50 percent drop in the number of encounters at our southern border, we are executing our consequence regime exactly as planned."[11]

Similarly, as discussed above, DHS made misrepresentations on this topic at trial in *Florida v. United States*, claiming vacatur of Parole + ATD would have "disastrous consequences" that would begin "the day after [Parole + ATD] was ended," even though DHS was no longer using the policy. *See* Doc. 156 at 184, *Florida v. United States*, 3:21-cv-1066 (N.D. Fla. Feb. 16, 2023) (quoting Tr. Day 4, 227:19–25).

And even if DHS will be harmed to some degree by this Court's injunction, that harm was caused by DHS's decision to slow walk its appeal of the Court's order in *Florida v. United States* and by DHS's failure to take any other action in response to the Court's vacatur. If DHS truly needed an *en masse* parole policy to manage the Southwest Border, it should have availed itself of the seven-day stay this Court allowed so that it could seek emergency appellate relief. At a minimum, it should

---

[10]   https://abcnews.go.com/Politics/week-transcript-5-14-23-sec-alejandro-mayorkas/story?id=99308498.

[11]   https://abcnews.go.com/Politics/week-transcript-5-14-23-sec-alejandro-mayorkas/story?id=99308498.

not have waited 58 days to file its notice of appeal. "[A] party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted." 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (3d ed. 2023); *accord Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021), *stay denied*, *Biden v. Texas*, 142 S. Ct. 926 (2021).

Finally, DHS's harm is further self-inflicted because the crisis at the border was entirely predictable and was created by Defendants' own actions. As this Court recognized in *Florida v. United States*, "[DHS] effectively incentivized what they call 'irregular migration' that has been ongoing since early 2021 by establishing policies and practices that all-but-guaranteed that the vast majority of aliens arriving at the Southwest Border who were not excluded under the Title 42 Order would not be detained and would instead be quickly released into the country where they would be allowed to stay (often for five years or more) while their asylum claims were processed or their removal proceedings ran their course . . . ." *Florida v. United States*, 2023 WL 2399883, at *7.

## CONCLUSION

In sum, for the reasons stated above, the Court finds that Florida is entitled to a preliminary injunction preventing the implementation and enforcement of DHS's newly adopted parole policy and an order postponing the policy's effective date. No bond is required. Accordingly, it is

**ORDERED** that:

1. The Temporary Restraining Order, Doc. 10, is dissolved.

2. DHS is enjoined from implementing or enforcing the parole policy contained in the May 10, 2023, Memorandum from U.S. Border Patrol Chief Raul Ortiz, titled "Policy on Parole with Conditions in Limited Circumstances Prior to Issuance of a Charging Document (Parole with Conditions)."

3. The effective date of that policy is postponed pending this Court's review pursuant to 5 U.S.C. § 705.

4. DHS's motion for a stay pending appeal is denied.

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival (FBN 1016188)
CHIEF OF STAFF

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Natalie P. Christmas (FBN 1019180)
COUNSELOR TO THE ATTORNEY GENERAL

Joseph E. Hart (FBN 124720)
COUNSELOR TO THE ATTORNEY GENERAL

Anita Patel (FBN 70214)
ASSISTANT BUREAU CHIEF

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

## CERTIFICATE OF SERVICE

I certify that on May 15, 2023, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which provides service to all parties.


/s/ James H. Percival
Chief of Staff