UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**STATE OF FLORIDA**,

    **Plaintiff**,

v.                                                                           Case No. 3:23cv9962-TKW-ZCB

**ALEJANDRO MAYORKAS**, et al.,

    **Defendants**.
_____/

## ORDER REQURING PERIODIC REPORTS

This case is before the Court based on DHS's response to the May 16 and 23 Orders (Doc. 53). The response confirms the Court's findings in *Florida I*[1] about the inefficacy of using "parole" as a processing pathway and shows that the Parole with Conditions (PWC) policy is akin to what Florida described in its original complaint in *Florida I* as "immigration enforcement by the honor system" because more than 41% (1065/2572) of the aliens released under the PWC policy after the Court enjoined it have not "checked in" with ICE as directed and DHS has not decided what, if anything, it is going to do about it.

Under the PWC policy, aliens arriving at the border were released into the country on "parole" with the condition that they check in with ICE within 60 days

---

[1] *Florida v. United States*, 2023 WL 2399883 (N.D. Fla. Mar. 8, 2023).

so they could be issued a Notice to Appear (NTA) and be placed in removal proceedings. Not surprisingly, a substantial number (41%) of the aliens did not check in with ICE as directed.² And, of those aliens who did check in, only a fraction have been issued an NTA—which means that immigration proceedings against those aliens have not even commenced.

All totaled, only 18% (464/2572) of the aliens released under the PWC policy after it was enjoined by the Court have been issued an NTA and placed in removal proceedings. The other 82% (2108/2572) are either awaiting the issuance of an NTA (1043) or their whereabouts are unknown (1065).³

These statistics are troubling to say the least. But even more troubling is the fact that DHS apparently does not have a plan in place to track down the aliens who are in violation of the conditions of their "parole"—and, thus, unlawfully in the country. Although DHS claims in the response that it "is prepared to take such actions as may be required to ensure that individuals who were released pending the

---

² The 41% no-show rate for the PWC policy was higher than the noncompliance rate for policies at issue in *Florida I*. *See* 2023 WL 2399883 at *8, 11 (finding that 30% of the aliens released under the Notice to Report policy and 35% of the aliens released under the Parole plus Alternatives to Detention policy checked in with ICE as directed).

³ The 2,108 aliens that are in the country without at least being in immigration proceedings is 2,108 more than there should be because, under, 8 U.S.C. §1225(b), all of the aliens who were released under the PWC policy should have been placed in immigration proceedings and detained pending completion of those proceedings. Of course, these 2,018 aliens are only the tip of the iceberg because thousands more aliens were released under the PWC policy before it was enjoined and hundreds of thousands more were released on "parole" or otherwise without being placed in removal proceedings under the policies at issue in *Florida I*.

2

initiation of their immigration court proceedings comply with the terms of their release" and that it "maintains its commitment that individuals have an obligation to comply with requirements imposed by DHS," Doc. 53 at 4, the Court is skeptical that DHS is serious about tracking down the aliens who did not check in as directed or that it will take any action against them if it ever finds them—particularly given what the evidence in *Florida I* showed about the costs and administrative burdens involved in tracking down aliens who failed to report to ICE under the policies at issue in that case. *See* 2023 WL 2399883 at *8, 11 (discussing the costly and time-consuming "Operation Horizon" program).

Notably, the ICE official whose declaration was attached to the response did not say that enforcement action <u>will</u> be taken against the aliens who violated the conditions of their parole under the PWC policy if DHS is able to find them. Rather, he only said that "ICE <u>may</u> take enforcement action against those [aliens]," Doc. 53-1 at ¶15 (emphasis added), and that one potential enforcement action might be "initiation of removal proceedings," *id.* Given that the initiation of removal proceedings is what was supposed to happen if the alien had checked in as directed, it is hard to understand why DHS thinks that aliens will take any of its directives seriously if their "punishment" for not doing so ends up being the same thing that would have happened if they complied.

3

That said, the Court does not have the authority to order DHS to track down and take into custody the aliens who should not have been released under the enjoined PWC policy and who are in violation of their "parole" and unlawfully in the country. All the Court can do at this point is require DHS to continue to provide updated information on those aliens—for whatever that is worth to those who are responsible for overseeing DHS and holding its policymakers accountable for their acts and omissions.

Accordingly, it is **ORDERED** that:

1. DHS shall file supplemental reports every 30 days providing updated information about the status of the 2,572 aliens released under the PWC policy after the policy was enjoined by the Court. The next report is due on August 18, 2023.

2. The supplemental reports shall include the same information required by the May 16 and 23 Orders, as well as a summary of any developments (e.g., check-ins, NTAs issued) since the prior report.

**DONE and ORDERED** this 18th day of July, 2023.

_____
**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**