## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

STATE OF FLORIDA,

     Plaintiff,

v.                                     Case No.  3:23-cv-9962-TWK-ZCB

ALEJANDRO MAYORKAS;
et. al,

     Defendants.

_____

## <u>DEFENDANTS' DECEMBER 2023 SUPPLEMENTAL REPORT</u>

In accordance with the Court's May 16, May 22, July 18, and September 17, 2023 Orders (ECF Nos. 31, 36, 54, and 58), Defendants submit the attached Declaration of Daniel A. Bible ("Bible Decl.") with attached reporting data. The Court's initial orders required Defendants to report the following with regard to the 2,572 noncitizens who were released from U.S. Customs and Border Protection ("CBP") after 11:59 p.m. ET on May 11, 2023: (1) the number of noncitizens who have reported to U.S. Immigration and Customs Enforcement ("ICE") and been issued Notices to Appear ("NTAs"); (2) when, where (city and state), and how (in person or online) these noncitizens reported to ICE and were issued NTAs; and (3) what steps ICE is taking to track down noncitizens who did not report as required and whether those efforts have been successful. ECF Nos. 31 and 36. The Court's July

1

18, 2023 Order required Defendants to report this same information at monthly intervals thereafter, "as well as a summary of any developments … since the prior report." ECF No. 54 at 4.

The Court's September 27, 2023 Order required that Defendants' next status report also explain "(a) why all aliens who have 'checked in' have not been issued an NTA or other charging document by now; (b) how long after the alien checks in it is taking for Defendants to issue an NTA or other charging document and why it is taking so long to do so; and (c) the purported legal basis pursuant to which the aliens who have checked-in but are not yet in immigration proceedings are still in the country." ECF No. 58. Finally, the Court also asked Defendants to explain "what enforcement action, if any, was taken against each of the 100 aliens who were still unaccounted for in the September status report as they are located." *Id.*

As previously explained, ICE defines a "check-in" as occurring when either: (1) an appointment record is created in the Field Office Appointment Scheduler (FOAS) or Enforcement Case Tracking System (ENFORCE) Alien Removal Module (EARM); (2) contact is made with an ICE office as instructed or there is a subsequent encounter (documented in EARM with ICE ERO) resulting in an enforcement action; (3) a Docket Status of Case Received in EOIR (Executive Office for Immigration Review) is observed; (4) contact is made with ERO Contact Center of Operations (ECCO) via the Detention Reporting Information Line (DRIL); or (5) contact is made

with ECCO via the Online Change of Address (OCOA) tool. ECF No. 53-1, ¶ 7. When at least one member of a family unit "checks-in" as described above, then all members of the family unit are considered "checked-in." *Id.*

As explained in the attached declaration of Daniel A. Bible, in response to the Court's first question, ICE reports that of the 2,572 noncitizens identified for this reporting, 2,538 have checked in with ICE, while 34 have not checked in. Bible Decl. ¶ 5. Out of the 2,535 noncitizens who have checked in, 2,134 individuals have been served with a charging document currently pending on an EOIR docket, and 404 individuals have not yet been served with a charging document currently pending on an EOIR docket even though they have checked in. *Id.* ¶ 6.

In response to the Court's second question, ICE reports that 1,166 noncitizens have received a charging document via Certified Mail or Regular Mail, and 967 noncitizens have received a charging document in-person. *Id.* ¶ 7. Additionally, ICE provides the following breakdown of the number of noncitizens who checked in with specific ICE ERO Offices:

| Check-In Location | Count |
|---|---:|
| Atlanta, GA | 141 |
| Baltimore, MD | 48 |
| Boston, MA | 208 |
| Buffalo, NY | 15 |
| Chicago, IL | 251 |
| Dallas, TX | 119 |
| Denver, CO | 101 |
| Detroit, MI | 72 |
| El Paso, TX | 24 |
| Houston, TX | 51 |
| Los Angeles, CA | 103 |
| Miami, FL | 175 |
| New Orleans, LA | 93 |
| New York City, NY | 441 |
| Newark, NJ | 140 |
| Philadelphia, PA | 62 |
| Phoenix, AZ | 26 |
| Salt Lake City, UT | 58 |
| San Antonio, TX | 47 |
| San Diego, CA | 6 |
| San Francisco, CA | 169 |
| Seattle, WA | 49 |
| St. Paul, MN | 42 |
| Washington, DC | 97 |
| **Total** | **2,538** |

*Id.* ¶ 8. The "Check-In Location" for an in-person check-in reflects the Area of Responsibility (AOR) where it occurred. *Id.* For an online check-in, "Check-in Location" reflects the location where the appointment was made. *Id.*

In response to the Court's third question, ICE reports that noncitizens in this cohort who failed to timely report to ICE or request a Notice to Appear (NTA) are in

violation of their parole conditions. *Id.* ¶ 9. As of the date of this report, 34 such noncitizens may be in violation of their parole conditions. *Id.*

In response to the Court's first question in the September 27, 2023 Order, inquiring "why all aliens who have 'checked in' have not been issued an NTA or other charging document," ERO personnel is instructed to prioritize the issuance of NTAs to this population and ERO continues to prioritize the issuance of these NTAs to this day. *Id.* ¶ 10. However, due to the overall large number of encounters and ERO having limited resources and personnel, and numerous responsibilities, this process has taken longer than anticipated. *Id.* Nevertheless, for this particular population, local offices are specifically tracking these cases, reviewing them on an individualized basis, and prioritizing these cases where operationally feasible. *Id.* Additionally, as discussed in Defendants' previous status reports, where ERO is unable to locate or contact a noncitizen (due to, e.g., the noncitizen providing an invalid address), ERO has generally referred the case to the ERO Fugitive Operations team or a similarly staffed at-large arrest team in the relevant area of responsibility to prioritize the location and appropriate enforcement action for noncompliant noncitizens. ECF Nos. 55, 56. The investigatory techniques local ERO teams employ to track noncompliant noncitizens ultimately depend on the circumstances unique to that individual and his or her location and activities. *Id.*

In response to the second question from the September 27, 2023 Order, asking

"how long after the alien checks in it is taking for [DHS] to issue an NTA or other charging document and why it is taking so long to do so," the duration between check-in and NTA issuance varies based on local office resources and the factual circumstances of each individual case. Bible Decl. ¶ 11. It can take from several hours to several weeks to complete processing and issue an NTA upon "check-in" depending on whether check-in was in person, online, or by phone. *Id.* The average NTA processing time in cases of noncitizens in this cohort who have been served with an NTA after checking in with ICE was approximately 45 days, due to the time necessary to verify the addresses the noncitizens provided. *Id.*

In response to the third question from the September 27, 2023 Order, seeking "the purported legal basis pursuant to which aliens who have checked-in but are not yet in immigration proceedings are still in the country," these individuals are all "applicants for admission" under section 1225(a)(1) who have been paroled pursuant to 8 U.S.C. § 1182(d)(5) and whose parole has lapsed following the expiration of the 60-day period under the PWC guidance. Bible Decl. ¶ 12. Once that parole has expired, they lack lawful status in the United States. *Id*. They face potential removal from the United States if served with a Notice to Appear in removal proceedings. 8 U.S.C. §§ 1182(a)(6)(A)(i) (noncitizens present without admission and not on parole are inadmissible), 1229a(a) (providing for proceedings to determine whether a noncitizen charged with inadmissibility is to be removed from the United States).

But the absence of lawful status alone does require any particular action by DHS with respect to any particular noncitizen. 8 U.S.C. §§ 1225 and 1229a govern when and how noncitizens apprehended at or near the border may be subject to removal proceedings should they be inadmissible or deportable from the United States. Section 1225 more specifically governs "applicants for admission," and section 1225(b)(2)(A) authorizes DHS to initiate removal proceedings under section 1229a for such individuals. That provision however does not mandate that the government remove any specific individual or to commence removal proceedings for anyone. *See, e.g., Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 523 (BIA 2011) ("broad discretion given to the Executive Branch regarding charging decisions in the criminal context [also applies] to charging decisions by the Executive Branch, that is, the DHS, in the immigration context"). Rather, with respect to noncitizens not determined to be subject to expedited removal—which includes all individuals subject to the court's order—§ 1225(b)(2)(A) "*authorizes* the Government to detain certain aliens" seeking admission to the United States *if* it determines to remove them under § 1225(b)(2)(A) through § 1229a removal proceedings. *Jennings v. Rodriguez*, 138 S. Ct. 830, 838 (2018) (emphasis added); *see also id.* at 842. The antecedent decision whether to pursue removal at all is a separate, discretionary decision of the Secretary that is not subject to judicial review—just as prosecutors' decisions whether to bring criminal charges against suspected offenders are not subject to judicial

review. *See Crane v. Johnson*, 783 F.3d 244, 249 (5th Cir. 2015) ("[i]t is undisputed that Section 1225(b)(2)(A) only directs [immigration officers] to detain an alien for the purpose of placing that alien in removal proceedings. The provision does not limit the authority of DHS to determine whether to pursue the removal of the immigrant" in the first place.); *Matter of Avetisyan*, 25 I. & N. Dec. 688, 690-91 (BIA 2012) (DHS is "invested with the sole discretion to commence [such] removal proceedings").

As the Supreme Court has explained, under these provisions, DHS has "broad discretion" to decide "whether it makes sense to pursue removal at all." *Arizona v. United States*, 567 U.S. 387, 396 (2012). If removal is initiated, "[a]t each stage" of this removal process, "the Executive has discretion to abandon the endeavor," including "for humanitarian reasons or simply for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999).

Further clarifying Congress's intent on this score, 8 U.S.C. § 1252(g) provides DHS with unreviewable discretion regarding its decisions whether and how to "commence proceedings, adjudicate cases, and execute removal orders." "There was good reason for Congress to focus special attention upon, and make special provision for, judicial review of the Attorney General's discrete acts of "commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders"—which represent the initiation or prosecution of various stages in the deportation process. At each stage the Executive has discretion to abandon the endeavor" or, conversely, to

decide to withhold a request for deferral of action and proceed. *Reno*, 525 U.S. at 483. *Reno* thus clearly holds that Congress intended to shield the Executive's determinations concerning "the initiation or prosecution of various stages in the deportation process" from "judicial intervention outside the streamlined process that Congress has designed." 525 U.S. at 483, 485. Given that DHS may abandon the removal proceeding at any time, Congress hardly would have required the agency to initiate a removal proceeding it has no intention to pursue. *See id*.

Lastly, separate and apart from the foregoing, following *United States v. Texas*, 143 S. Ct. 1964 (2023), there is no basis for any Court to assert jurisdiction to compel the government to arrest and detain noncitizens in any greater or lesser frequency, or to take any enforcement action against any specific noncitizen. As the Court reaffirmed, "'a citizen'"—including a state sovereign—"'lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.'" *Id.* at 1968 (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)). An individual similarly has "no judicially cognizable interest in procuring" or preventing "enforcement of the immigration laws" against someone else. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984) (quoted in *United States v. Texas*, 142 S. Ct. at 1971). "In short, this Court's precedents and longstanding historical practice establish that" no possible plaintiff has Article III standing to seek a court order compelling the United States to arrest or detain more or fewer

noncitizens. *Texas*, 142 S. Ct. at 1971.

Finally, in response to the Court's last question, asking "what enforcement action, if any, was taken against each of the 100 aliens who were still unaccounted for in the September status report as they are located," out of 37 noncitizens who failed to check-in on the last report: 3 noncitizens have since checked in to be processed for NTAs. Bible Decl., ¶ 13. ERO fugitive teams continue looking for those who provided an invalid address or did not appear at the address they provided. *Id.*

Date: December 18, 2023                    Respectfully submitted,

JASON R. COODY                            BRIAN M. BOYNTON
*United States Attorney*                   *Principal Deputy Assistant Attorney General*

MARIE A. MOYLE                            WILLIAM C. PEACHEY
*Assistant United States Attorney*         *Director*
Northern District of Florida
                                          SARAH L. VUONG
                                          *Assistant Director*

                                          BRIAN C. WARD
                                          *Senior Litigation Counsel*

                                          ERIN T. RYAN
                                          JOSEPH A. DARROW
                                          *Trial Attorneys*

                                          /s/ *Elissa P. Fudim*
                                          ELISSA P. FUDIM
                                          *Trial Attorney*
                                          U.S. Department of Justice
                                          Office of Immigration Litigation
                                          District Court Section
                                          P.O. Box 868, Ben Franklin Station

Washington, DC 20044
Tel.: (202) 598-6073
Elissa.p.fudim@usdoj.gov

*Counsel for Defendants*

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on December 19, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which provided an electronic notice and electronic link of the same to all attorneys of record. (This document was finalized for filing at 3:04 pm December 18, 2023, with a Certificate of Service dated the same, but the filing was not completed. I am attempting to do it again now and have updated the Certificate of Service accordingly.)

By: */s/ Elissa P. Fudim*
**ELISSA P. FUDIM**
Trial Attorney
United States Department of Justice
Civil Division